David K. WACHTEL, Jr. and Hickory Investments, Inc., Petitioners,

v.

OFFICE OF THRIFT SUPERVISION, Respondent.

David K. WACHTEL, Jr., John W. Haley, Charles W. Bone, W.L. Bone, J. Thomas Holland, II, and Hickory Investments, Inc., Petitioners,

v.

Timothy RYAN, Director, Office of Thrift Supervision, Respondent.

John W. HALEY, Petitioner,

v.

OFFICE OF THRIFT SUPERVISION, Respondent.

J. Thomas HOLLAND, II, Petitioner,

v.

OFFICE OF THRIFT SUPERVISION, Respondent.

Nos. 91–1580, 91–1590, 91–1591 and 91–1600.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1992.

Decided Jan. 15, 1993.

John C. Deal, Columbus, OH, with whom Robert J. Walker, Bob F. Thompson, Bennett L. Ross, Aubrey B. Harwell, Jr., and Ronald G. Harris, Nashville, TN, Attorneys, were on the joint brief, for petitioners David K. Wachtel Jr., John W. Haley, and Hickory Investments, Inc. J. Houston Gordon, Covington, TN, and Joseph N. Barker, Nashville, TN, Attorneys, were on the joint brief for petitioners Charles W. Bone, W.L. Bone, and J. Thomas Holland, II.

Dirk S. Roberts, Acting Asst. Chief Counsel, Office of Thrift Supervision, with whom Harris Weinstein, Chief Counsel, Carolyn B. Lieberman, Senior Deputy Chief

Counsel, Thomas J. Segal, Deputy Chief Counsel, Geraldine Gennet, Sr. Trial Atty., and Frances M. Recio, Trial Atty., Office of Thrift Supervision, Washington, DC, were on the brief, for respondent. Steven W. Dimmick and Jory M. Hochberg, Washington, DC, also entered an appearance for respondent.

Before: SILBERMAN, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

█ Petitioners, a savings bank's holding company and its stockholders, seek review of an order issued by the Office of Thrift Supervision (OTS). The order directs petitioners to pay OTS $5.3 million on the ground that they were subject to a condition imposed in writing which required them to maintain the net worth of the savings bank subsidiary. Petitioners deny the existence of an enforceable agreement and alternatively contend that 12 U.S.C. § 1818 requires OTS to demonstrate either unjust enrichment or reckless disregard of their legal obligations before it can impose such an order. OTS has interpreted the statute not to require either showing. We reject OTS's rather bizzare construction of the statute. Absent a finding of the requisite misconduct to seek relief under § 1818(b)(6)(A), we believe OTS lacks authority to issue its order, and, therefore, we grant the petition for review.

## I.

Hickory Investments, Inc. is a holding company that owns 94% of Investors Federal Savings Bank of Nashville, Tennessee (the bank).[1] The individual petitioners, David K. Wachtel, Jr., John W. Haley, Charles W. Bone, W.L. Bone, and J. Thomas Holland, together own all of Hickory's stock. In 1977, before any of the individual petitioners purchased Hickory stock, the bank applied to have the Federal Savings and Loan Insurance Corporation (FSLIC) insure its accounts. Hickory filed an application with the Federal Home Loan Bank Board (FHLBB) to retain control of the bank, pursuant to former 12 U.S.C. § 1730a(e) (repealed by the Federal Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–93, 1103 Stat. 183). Both applications were approved on March 4, 1977. FHLBB conditioned its approval on Hickory's agreement to "stipulate" that it would cause the net worth of the bank to be maintained in accord with the requirements of 12 C.F.R. § 563.13 (currently codified at 12 C.F.R. § 567.2) "as now or hereinafter in effect" and would "infuse sufficient and additional equity capital to effect compliance with such requirement." Hickory's board, thereupon, passed two resolutions that mirrored the language of the FHLBB approval notice (the 1977 stipulations).

Two years later, the first of the individual petitioners, Charles W. Bone, invested in Hickory. He bought 11% of Hickory's common stock and became a director of the bank. The ownership structure of Hickory further changed in 1984 when the four other individual petitioners purchased shares. Hickory, pursuant to former 12 U.S.C. §§ 1730(q) and 1730a(e) (both repealed by FIRREA), sent a "Notice of Change in Control" to the FHLBB regional office in Cincinnati, Ohio. Since Hickory simultaneously wanted to increase its stake in the bank from 73% to 90% and proposed to borrow funds to finance this acquisition, it also filed a debt application (Form H-(g)) with the FHLBB. The regional office approved Hickory's change of control but conditioned approval of the debt application on the provision of certain stipulations. The individual petitioners were required to affirm Hickory's obligation to maintain the bank's net worth under the 1977 stipulations and to stipulate further that they would cause the bank's net worth to be maintained in accord with the requirements of 12 C.F.R. § 563.13 "as now or hereinaf-

---

1. Investors is a federal "savings bank" rather than a savings and loan, and we refer to it as "the bank." Both savings banks and savings and loans are regulated by OTS. 12 U.S.C. § 1813(b), (q)(4).

ter in effect" and would "infuse sufficient and additional equity capital to effect compliance with such requirement." In response, the individual petitioners sent a letter dated August 21, 1984, to the regional director, furnishing the requested stipulation (the 1984 stipulations). On that date, all of the individual petitioners became directors of Hickory, and all but W.L. Bone became directors of the bank.

By June of 1986, the bank had fallen short of its regulatory net worth requirements by $256,000. Hickory planned to borrow additional capital to cure the deficiency and, accordingly, filed a second debt application on September 10, 1986. The regional director once again conditioned approval on the individual petitioners making certain stipulations, including the net worth maintenance agreement. Petitioners furnished the stipulation but added a parenthetical describing their obligation to maintain the bank's net worth as "on a best efforts basis as it relates to the use of personal assets." (The 1986 stipulations). The regional director, however, did not accept the "best efforts" language. The individual petitioners signed personal guarantees to the lender to secure the loan.

After Hickory had injected the borrowed funds downstream as bank capital, the bank maintained its regulatory net worth levels throughout 1987 and 1988. But by early 1989, the bank was again suffering a net worth deficiency. Several times during 1989, FHLBB, and then its successor agency, OTS, criticized the bank's net worth shortfall and requested that Hickory and the individuals take corrective actions. While Hickory and the individuals searched for a source of additional capital through an acquisition or merger, the bank's net worth condition further deteriorated. OTS filed a Notice of Charges against Hickory and the individuals under its cease and desist authority, 12 U.S.C. § 1818(b)(1), on January 30, 1990, citing their failure to maintain the bank's net worth. And, on March 9, 1990, OTS placed the bank under the Resolution Trust Corporation's receivership. At that time, the bank had a net worth deficit of $5.3 million, and the individual petitioners owed $2 million because of their personal guarantees of the 1986 loan.

OTS alleged that Hickory and the individuals had violated a condition imposed in writing by the agency to maintain the bank's net worth—a necessary predicate for OTS to issue a cease and desist order. 12 U.S.C. § 1818(b)(1). OTS also alleged that all the petitioners had been unjustly enriched and that the individual petitioners had acted in reckless disregard of their legal obligations. These allegations, if established, would have satisfied the requirements for the imposition of a monetary remedy under 12 U.S.C. § 1818(b)(6)(A). The ALJ, after a hearing, recommended against a cease and desist order because, in his view, none of Hickory's applications or accompanying stipulations constituted written agreements. Furthermore, the ALJ found no evidence to support a finding of reckless conduct or unjust enrichment necessary for the OTS to order payments under § 1818(b)(6)(A). The OTS Director rejected the ALJ's recommended decision and determined that the requests for the 1977, 1984, and 1986 stipulations were conditions imposed in writing. *Without finding* unjust enrichment or reckless disregard of legal obligations, he ordered the petitioners to pay $5.3 million to rectify the bank's net worth deficiency. Hickory and the individual directors petition for review.

## II.

■ Petitioners present us, through the auspices of two law firms, with a veritable blizzard of arguments (including even constitutional claims) challenging OTS' order. Perhaps the most vexing question that emerges is whether petitioners ever violated a "condition imposed in writing by the agency" or a "written agreement" with OTS—only then would OTS have authority under § 1818(b)(1) to impose a cease and desist order of any kind. The parties argue extensively as to whether the various communications between OTS' predecessors and Hickory (or the individual petitioners) constitute written agreements or conditions within the meaning of the statute, or whether they should properly be

**584**

thought of as more informal understandings. We do not have to decide this issue, however, because assuming, *arguendo,* that OTS' view on this matter (that the agreements to stipulate are conditions imposed in writing) is correct, we agree with petitioners that OTS wholly lacked authority to issue the order directing petitioners to pay the government $5.3 million.[2]

The relevant sections of the statute, §§ 1818(b)(1) and 1818(b)(6), are as follows:

12 U.S.C. § 1818(b)(1):

> If ... the agency has reasonable cause to believe that the depository institution or any institution-affiliated party ... is violating or has violated, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to violate, a law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the depository institution or any written agreement entered into with the agency, the agency may issue and serve upon the depository institution or such party a notice of charges in respect thereof.... [T]he agency may issue and serve upon the depository institution or the institution-affiliated party an order to cease and desist from any such violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

12 U.S.C. § 1818(b)(6):

> **Affirmative action to correct conditions resulting from violations or practices.** The authority to issue an order under this subsection and sub-

section (c) of this section which requires an insured depository institution or any institution-affiliated party to take affirmative action to correct any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such depository institution or such party to—

> (A) make restitution or provide reimbursement, indemnification, or guarantee against loss if—

> (i) such depository institution or such party was unjustly enriched in connection with such violation or practice; or

> (ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;

> (B) restrict the growth of the institution;

> (C) dispose of any loan or asset involved;

> (D) rescind agreements or contracts; and

> (E) employ qualified officers or employees (who may be subject to approval by the appropriate Federal banking agency at the direction of such agency); and

> (F) take such other action as the banking agency determines to be appropriate.

As is apparent from examination of § 1818(b)(1), OTS is authorized to issue orders that require a respondent either to cease and desist from certain conduct or to engage in "affirmative action" to remedy its behavior. It seems to us equally apparent that, as petitioners contend, § 1818(b)(6) describes the sorts of affirmative action that the agency is empowered to

---

**2.** OTS also argues that the petitioners should be equitably estopped from challenging OTS' order. OTS claims that because the petitioners received the benefit of regulatory approval only after agreeing to the net worth maintenance condition, they cannot deny their obligation or contest the order now. OTS, however, has not pointed to any representation by the petitioners

that affirmed an obligation enforceable through a cease and desist order as opposed to a less formal obligation. Even if the petitioners were precluded from contesting the existence of an obligation, they would remain free to argue that OTS exceeded its statutory authority by failing to show unjust enrichment or reckless disregard for the law.

require. Subsection (A) of that section, it will be noted, authorizes the agency to require a party to "make restitution or provide reimbursement, indemnification, or guarantee against loss if" (and, presumably, only if) the party was "unjustly enriched" or its conduct involved reckless disregard of its legal obligations. Petitioners' argument then is simple: there is no finding of either unjust enrichment or reckless disregard, and, therefore, OTS' order is patently *ultra vires.*

The government's response is not simple; indeed, it is barely intelligible. One might think OTS would claim that the order before us was somehow not one requiring "restitution, . . . reimbursement, indemnification or guarantee against loss," 12 U.S.C. § 1818(b)(6)(A), and therefore it was covered by § 1818(b)(6)(F), which authorizes OTS to "take such other action as the banking agency determines to be appropriate." Not quite. Instead, the government contends, in accordance with OTS' order, that the term "affirmative action" in § 1818(b)(1) is not limited at all by what might be thought to be a definition of affirmative action in § 1818(b)(6). We should think of the term used in § 1818(b)(1), instead, as more free-floating, not necessarily bound to Congress' elaboration of the phrase in § 1818(b)(6); as far as we can tell, for that matter, not particularly bound to any linguistic restraint in the statute.

█ The agency based its order solely on § 1818(b)(1), and therefore, before us uses § 1818(b)(6)(F) only to argue that "section (b)(6) does not restrict the remedies available under section (b)(1)." *Cf. Akin v. OTS,* 950 F.2d 1180, 1183 n. 3 (5th Cir.1992) (rejecting OTS' reliance on § 1818(b)(6)(F) for the first time on appeal). In other words, the government suggests that § 1818(b)(6)(F) is so broad that it overwhelms all else in (b)(6). Under that reading, § 1818(b)(6) essentially means nothing

and could not limit § 1818(b)(1). This argument is so convoluted it reminds us of Justice Jackson's famous line in *Chenery II.* "I give up. Now I realize fully what Mark Twain meant when he said, 'The more you explain it the more I don't understand it.' " *SEC v. Chenery Corp.,* 332 U.S. 194, 214, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (Jackson, J., dissenting). It seems to us almost frivolous to claim that the agency's authority to require affirmative action in § 1818(b)(1) is not limited by the later section, § 1818(b)(6), in which Congress sets forth what it means by "affirmative action." [3] Even were § 1818(b) a statutory provision applied only by OTS—it is actually also administered by the Federal Reserve Board, the Comptroller of the Currency, and the FDIC, and thus deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is inappropriate [4]—we would not defer to OTS' interpretation since the statutory language is not ambiguous and the agency's construction is capricious.

The government, to be sure, does alternatively argue that § 1818(b)(6)(A) does not cover its order because the money it would extract from petitioners is not really restitution, reimbursement, indemnification, or guarantee against loss. Since the government does not claim that the order is authorized by § 1818(b)(6)(F), this argument has a disembodied quality because it is unclear what portion of § 1818(b)(6) would, under this alternative argument, authorize the order. (We have already rejected OTS' attempt to assert authority to order affirmative action under § 1818(b)(1) without regard to § 1818(b)(6).) Even assuming, however, that the government were to contend or was actually contending that its order was authorized by § 1818(b)(6)(F) as "other action," we also reject that slightly more plausible construction.

---

**3.** OTS does point out that subsection (b)(6) was added to § 1818(b) in 1989, but OTS does not provide any explanation as to why that sequence supports its interpretation.

**4.** *See, e.g., Professional Reactor Operator Soc'y v. NRC,* 939 F.2d 1047, 1051 (D.C.Cir.1991). *But see Akin,* 950 F.2d at 1135 (applying *Chevron* deference to OTS' interpretation of § 1818(b) without noting that the statute is administered by several agencies).

By using the terms restitution, reimbursement, indemnification, or guarantee against loss, Congress appears to us to have tried to describe all those circumstances in which an officer, director, or holding company might be thought obligated to pay money to a depository institution. Congress passed § 1818(b)(6)(A) in response to *Larimore v. Comptroller of the Currency,* 789 F.2d 1244 (7th Cir.1986) (en banc). *See* H.R.REP. No. 54(I), 101st Cong., 1st Sess. 468, *reprinted in* 1989 U.S.CODE & ADMIN.NEWS 86, 264. In *Larimore,* the Seventh Circuit held that, absent unjust enrichment, the regulatory agency could not impose personal liability on a director and require him to indemnify his financial institution, even if he had clearly violated the law. *See Larimore,* 789 F.2d at 1251–56. Congress thus crafted § 1818(b)(6)(A) to broaden the power of regulators to order monetary payments beyond the confines set by the *Larimore* court if reckless disregard of the law could be shown, but otherwise maintained limits on monetary relief in cases that did not involve unjust enrichment. S. REP. No. 19, 101st Cong., 1st Sess. 40 (1989) ("It is the Committee's intent ... that this power be used only in appropriate cases, for example, when the institution-related party has unjustly enriched himself at the institution's expense or when the institution-related party has acted in reckless disregard of the banking laws or regulation. It is not intended that this power will be used in cases where the institution-related party engaged in less serious violations or less serious conduct.").

The government has suggested no reason why Congress would have wanted OTS' monetary claim against petitioners—an enforcement of their "stipulation" to maintain the bank's net worth—to stand on a different footing than the monetary relief described in § 1818(b)(6)(A). The government did, after all, initially claim that petitioners acted with reckless disregard and were unjustly enriched but dropped those assertions after the ALJ determined otherwise. And OTS has used § 1818(b)(6)(A) to seek enforcement of a net worth agreement where it could establish unjust enrichment. *See Akin,* 950 F.2d at 1183–84. In

any event, as we understand the government's position, the alleged net worth agreement fits exactly the term a "guarantee against loss." The government argues it had the right to pursue its claim against petitioners regardless of the reason for the deficiency, which in our view makes the condition a blanket guarantee. And, the net worth deficiency at the time the bank was taken into receivership should be understood as merely the balance sheet manifestation of the "loss."

\* \* \* \* \* \*

In sum, the government simply cannot make a monetary claim against petitioners under § 1818 without meeting the prerequisites of § 1818(b)(6)(A)—a showing of either reckless disregard of legal obligations or unjust enrichment. We recognize that S & L investors are now about as popular in Washington, D.C. as were Hollywood screen writers in the early 50's or oil company executives in the early 70's. Perhaps that explains why OTS' efforts in this case to circumvent the statutory language strike us as attributable not so much to creative lawyering as to excessive zeal.

The petition for review is granted.