# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 7, 2016          Decided March 21, 2017

No. 15-1102

KIMBERLY STEWART, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED FOOD & COMMERCIAL WORKERS LOCAL 99,
INTERVENOR

———

On Petition for Review of an Order
of the National Labor Relations Board

———

*Glenn M. Taubman* argued the cause and filed the briefs for petitioners.

*David Seid*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Ruth E. Burdick*, Supervisory Attorney.

*Kristin L. Martin* argued the cause for intervenor. With her on the brief was *Eric B. Myers*.

Before: SRINIVASAN and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Dissenting opinion filed by *Senior Circuit Judge* SILBERMAN.

SRINIVASAN, *Circuit Judge*: Employees commonly pay their union dues through a mechanism known as a checkoff arrangement. In a checkoff arrangement, an employee authorizes her employer to deduct union dues from her paycheck and remit the dues directly to the union on her behalf. That arrangement affords convenience and efficiency. It enables unions to avoid collecting payments from potentially numerous individual employees, and it enables employees to avoid writing periodic dues checks to the union.

An employee's authorization for her employer to check off union dues from her wages is not irrevocable. A federal statute, Section 302(c)(4) of the Labor Management Relations Act, specifies circumstances in which an employee must be afforded the opportunity to revoke a checkoff authorization. And collective bargaining agreements, when establishing the availability of a checkoff arrangement for paying dues, correspondingly set out how an employee can revoke an authorization.

In this case, a group of employees, during the period between the expiration of the operative collective bargaining agreement and the commencement of a new one, resigned from their union and sought to revoke their dues-checkoff authorizations. The company, however, continued to deduct union dues from the employees' wages, and the union continued to accept the payments. The National Labor

Relations Board rejected charges that the company and union had committed an unfair labor practice by continuing to check off union dues from the employees' wages.

We vacate the Board's decision and remand the matter to the agency. The Board treated the case as a straightforward application of its precedent pertaining to the revocability of dues-checkoff arrangements. But the circumstances of this case, as it comes to us, differ in significant ways from those in the precedent on which the Board relied. On remand, if the Board were to attempt to reach the same result again, it would need to explain how the outcome could be squared with its precedent and governing law. Because the Board's decision, as it stands, lacks any such explanation, we cannot sustain it.

I.

A.

Section 302(c)(4) of the Labor Management Relations Act speaks to the revocability of an employee's dues-checkoff authorization. The Act generally makes it a crime for an employer to give payments to a labor union. 29 U.S.C. § 186. Section 302(c)(4) establishes an exception to that prohibition for dues-checkoff transfers from an employer to a union on an employee's behalf. The exception states that the criminal bar on employer payments to a union is inapplicable "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization." *Id.* § 186(c)(4).

The exception requires, however, that an employee's checkoff authorization be revocable in enumerated circumstances. In particular, the employer must have "received from each employee, on whose account such deductions are made, a written assignment which shall not be

irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner." *Id.*

Those criminal provisions are administered by the Attorney General, not the National Labor Relations Board. But the Board has long held that employers and unions engage in unfair labor practices under Sections 8(a)(1)-(3) and 8(b)(1)(A) of the National Labor Relations Act if they check off union dues without an employee's valid authorization. *See e.g., Frito-Lay, Inc.*, 243 NLRB 137, 137 (1979). And in examining whether employers and unions have committed unfair labor practices in that connection, the Board has interpreted Section 302(c)(4)'s directive that an employee's checkoff authorization "shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner." 29 U.S.C. § 186(c)(4).

The Board has long understood that language to "guarantee[] an employee two distinct rights when he executes a checkoff authorization under a collective-bargaining agreement." *Atlanta Printing Specialties*, 215 NLRB 237, 237 (1974), *enf'd*, 523 F.2d 783 (5th Cir. 1975). The first right, the Board explained in *Atlanta Printing*, is a "chance at least once a year to revoke his authorization" on the annual anniversary of his execution of the authorization. *Id.* The second right is "a chance upon the termination of the collective-bargaining agreement to revoke his authorization." *Id.* And because the employer and union in *Atlanta Printing* had denied the "statutory rights" conferred by Section 302(c)(4), the Board held that they had committed an unfair labor practice. *Id.* at 238.

The Board's later decision in *Frito-Lay, Inc.*, 243 NLRB 137 (1979), elaborates on its understanding of Section 302(c)(4) in a manner of particular relevance here. The employees in *Frito-Lay* executed checkoff authorizations which were irrevocable except during two 10-day "escape" windows corresponding to the dual rights recognized in *Atlanta Printing*: the first window was an annual 10-day period commencing 20 days before the yearly anniversary of an employee's checkoff authorization, and the second window was a 10-day period commencing 20 days before the expiration of the operative bargaining agreement. The employees in question attempted to revoke their checkoff authorizations during a hiatus period between bargaining agreements—i.e., after expiration of the operative agreement. The company and union denied the revocation requests and continued deducting union dues. They reasoned that, under the terms of the checkoff authorizations, the employees had been required to revoke during the specified 10-day window preceding the initial agreement's expiration, and had no entitlement to do so after its expiration.

The Board agreed, rejecting the General Counsel's argument that the company and union committed an unfair labor practice by continuing to check off union dues during the contract hiatus. The General Counsel, relying on Section 302(c)(4)'s guarantee of a revocation opportunity "beyond the termination date of the applicable collective agreement," contended that the employees had a statutory entitlement to revoke their checkoff authorizations after the initial agreement's expiration. The Board was unpersuaded. It initially indicated that a violation of Section 302(c)(4) would not necessarily establish an unfair labor practice (even though it had found an unfair labor practice in *Atlanta Printing* based on a denial of the rights granted by that section). *Id.* at 138. The Board went on to hold that, insofar as Section 302(c)(4)

bears on the existence of an unfair labor practice, there had been no violation of the statute. *Id.* at 138-39.

The Board explained that "there is no violation of Section 302(c)(4) . . . as long as employees are accorded an opportunity to revoke their authorizations at *least* once a year and at the termination of any applicable collective-bargaining agreements." *Id.* at 138. And in the Board's view, "the limiting of the opportunity to revoke to a reasonable escape period, such as between 20 and 10 days before the expiration of either of these periods, does not require a different result." *Id.* Because "the employees did not revoke their authorizations during either of these escape periods, the Union and Employer were justified in considering the authorizations still valid." *Id.* at 139.

Although the Board initially questioned in *Frito-Lay* the extent to which a violation of Section 302(c)(4) would necessarily occasion the finding of an unfair labor practice, it has since reverted to its understanding in *Atlanta Printing* of an association between Section 302(c)(4) and unfair labor practices relating to checkoff. *See Int'l Bd. of Elec. Workers (Lockheed)*, 302 NLRB 322, 325 n.8 (1991); *WKYC-TV, Inc.*, 359 NLRB 286, 289 n.13 (2012). And after *Frito-Lay* and *Atlanta Printing*, the Board understands Section 302(c)(4) to establish a statutory right to two opportunities to revoke a checkoff authorization: one tied to the annual anniversary of the authorization, and the second tied to the expiration of the operative collective bargaining agreement. With respect to each of those two opportunities, the Board concluded in *Frito-Lay*, the bargaining agreement can validly confine the available revocation window to a reasonable escape period preceding the anniversary and expiration dates, respectively.

B.

With that backdrop in mind, we turn to the dispute in this case. Fry's Food Stores is a retail grocery company with stores throughout Arizona. Arizona is a right-to-work state, meaning that employment cannot be conditioned on membership in a union or payment of union dues. But the company entered into a collective bargaining agreement with a union representing a unit of employees (United Food and Local 99, AFL-CIO) and the agreement established the availability of a checkoff arrangement for paying dues.

The agreement set forth the terms of an employee's checkoff authorization, which was to include a specification that "[t]his Check-Off Authorization and Agreement is separate and apart from the [Union] Membership Application and is attached to the Membership Application only for convenience." *Smith's Food & Drug Centers Inc.*, 358 NLRB 704, 706 (2012). The agreement also prescribed the language of the checkoff authorizations with regard to the periods in which an employee's authorization would be revocable. On that score, the checkoff authorizations were to state:

> This authorization and assignment shall be irrevocable for a period of one (1) year from the date of execution or until the termination date of the agreement between the Employer and Local 99, whichever occurs sooner, and from year to year thereafter, unless not less than thirty (30) days and not more than forty-five (45) days prior to the end of any subsequent yearly period I give the Employer and Union written notice of revocation bearing my signature thereto.

*Id*.

The relevant bargaining agreement prescribing those terms was in effect for a five-year period, from October 26, 2003, to October 25, 2008. During that time, a group of employees who are now the petitioners in this case executed checkoff authorizations containing the language quoted above. After the bargaining agreement expired, the company and union proved unable to agree on a successor contract for over a year, until November 12, 2009. (For much of the hiatus period between bargaining agreements, the parties entered into a series of short-term extension agreements carrying over the terms of the initial contract.)

Between the expiration of the initial agreement on October 25, 2008, and the execution of the new one on November 12, 2009, petitioners provided notice of their resignation from the union. They also sought to revoke the checkoff authorizations they had executed while the initial agreement was in effect. The union honored petitioners' resignations from its membership, but it refused to give effect to their attempted revocation of their checkoff authorizations. In letters to petitioners, the union explained that their attempted revocations had been untimely because, under the terms of their checkoff authorizations, they needed to revoke during the prescribed 15-day window preceding the anniversary of their authorizations (i.e., between 30 and 45 days before the anniversary date). The company therefore continued to deduct union dues from petitioners' paychecks.

Petitioners initiated unfair labor practice charges against the company. The Board's General Counsel then issued an amended complaint against the company and union, contending that the continued deduction and transfer of union dues during the contract hiatus constituted an unfair labor

practice. The General Counsel put forward two theories. First, he contended that petitioners had an entitlement to revoke their checkoff authorizations after the expiration of the operative collective bargaining agreement. Second, he argued that petitioners' resignations from union membership should have been treated as a revocation of their dues-checkoff authorizations and given effect as of the next available revocation period.

The ALJ dismissed the complaint and ruled in favor of the company and union. As a predicate to his analysis, the ALJ construed the checkoff authorizations' language concerning when an employee could revoke an authorization. First, the ALJ found, "every employee who signed an authorization during [the 2003-2008] contract could revoke the authorization during the window periods preceding the yearly anniversary date that the employee signed the authorization." *Smith's Food & Drug*, 358 NLRB at 708. "In addition, employees who signed authorizations during the last year of the contract could revoke their authorizations upon the expiration of that contract." *Id.*

In light of that understanding, the ALJ considered petitioners' requests to revoke their checkoff authorizations to have been invalid. None of them had submitted a revocation request during the yearly 15-day escape window preceding the anniversary date of their checkoff authorizations. Rather, they had sought revocation during the hiatus period between the collective bargaining agreements. As a result, the ALJ concluded, petitioners' requests had been untimely.

The ALJ rejected the argument that, notwithstanding the terms of the checkoff authorizations, petitioners had an entitlement to revoke upon the collective-bargaining agreement's expiration. Employees, the ALJ held, had no

right to "revoke their checkoff authorizations during time periods that are *not* specified in the authorizations that they had signed." *Smith's Food & Drug*, 358 NLRB at 707. The ALJ relied on the Board's decision in *Frito-Lay*. He understood *Frito-Lay* to have "rejected the notion that employees are free to revoke their checkoff authorizations at will during the hiatus period between contracts." *Id.* "Here, like in *Frito-Lay*," the ALJ determined, "employees were not entitled to withdraw at will during the hiatus period." *Id.*

The ALJ also rejected the argument that petitioners' resignations from union membership should have been treated as revocations of their checkoff authorizations. He relied on Board decisions "allow[ing] for the possibility that an employee may no longer wish to remain a member of a union but nonetheless desire[] to contribute to a union for contract administration expenses via a checkoff authorization." *Id.* at 707. The key question under the Board's decisions, the ALJ reasoned, is whether the language of an employee's checkoff authorization "clearly indicate[s] an agreement to pay dues irrespective of membership in the union." *Id.* at 706. The checkoff authorizations in this case, the ALJ concluded, met that standard.

The Board summarily affirmed the ALJ's rulings, findings, and conclusions, and adopted the ALJ's recommended order. Petitioners now seek review of the Board's decision in this court.

II.

Petitioners challenge the Board's decision on two grounds. Their chief argument is that the Board's precedent in *Frito-Lay*, on which the Board rested its decision below, cannot be squared with the terms of Section 302(c)(4) of the

Labor Management Relations Act. Their second argument is that the Board should have treated their resignations from the union as requests to discontinue the checkoff of union dues at the earliest available opportunity.

A.

We start with petitioners' challenge to the Board's decision in *Frito-Lay*. Petitioners rely on Section 302(c)(4)'s directive that an employee's checkoff authorization "shall not be irrevocable for a period of more than one year, *or beyond the termination date of the applicable collective agreement*, whichever occurs sooner." 29 U.S.C. § 186(c)(4) (emphasis added). The highlighted text, petitioners contend, grants employees an at-will entitlement to revoke a checkoff authorization upon the expiration of the operative collective-bargaining agreement, regardless of any language in a checkoff authorization purporting to require employees to seek revocation within a specified, pre-expiration escape window. The Board rejected that proposition in *Frito-Lay*. The Board saw no inconsistency with Section 302(c)(4) in enforcing a requirement to seek revocation during an escape window preceding the bargaining agreement's expiration.

The parties present this case as a referendum on *Frito-Lay*, in line with the Board's treatment of the case as a routine application of that decision. We see the case differently. On examination, the circumstances of this case turn out to differ significantly from those in *Frito-Lay*, so much so that we cannot sustain the Board's decision on the rationale on which it was grounded.

Recall that, in *Frito-Lay*, the Board understood there to be "no violation of Section 302(c)(4) . . . as long as employees are accorded an opportunity to revoke their

authorizations at *least* once a year *and at the termination of any applicable collective-bargaining agreements.*" 243 NLRB at 138 (second emphasis added). And in *Atlanta Printing* beforehand, the Board had likewise read Section 302(c)(4) to "guarantee[]" an employee the right to revoke an authorization "upon the termination of the collective-bargaining agreement." 215 NLRB at 237. The Board thus interpreted Section 302(c)(4) to call for *some* revocation opportunity tied to the collective-bargaining agreement's expiration (along with a revocation opportunity connected to the yearly anniversary of an employee's checkoff authorization). In *Frito-Lay*, the Board thought it adequate if the revocation opportunity connected to the agreement's expiration took the form of a reasonable, pre-expiration escape window (such as the 10-day window at issue in that case), rather than at-will revocation after the agreement expired. *See* 243 NLRB at 138-39.

But what about a case in which employees are denied *any* revocation opportunity in connection with the bargaining agreement's expiration? *Frito-Lay* does not speak to that question. All of the employees in *Frito-Lay* had a revocation window tied to the agreement's expiration, a consideration the Board thought pivotal in finding no inconsistency with Section 302(c)(4). And in *Atlanta Printing*, the Board had previously explained that employees must be afforded a chance to revoke their authorizations at the time of a bargaining agreement's expiration. *Frito-Lay* thus cannot be understood to establish the permissibility of circumstances in which employees generally lack any revocation opportunity connected to the expiration of the operative bargaining agreement.

This is just such a case, at least as it comes to us. For our purposes, what matters is the way in which the ALJ construed

the employees' checkoff authorizations. He concluded that, although all employees had a 15-day revocation window connected to the yearly anniversary of their checkoff authorizations, they had no such revocation opportunity with regard to the bargaining agreement's expiration. Specifically, the ALJ, in construing "the checkoff-authorization form in the context of the [2003-2008] collective-bargaining agreement," found that "every employee who signed an authorization during that contract could revoke the authorization during the window periods preceding the yearly anniversary date that the employee signed the authorization." *Smith's Food & Drug*, 358 NLRB at 706. But he perceived no comparable opportunity for all employees in connection with the agreement's expiration. Rather, only those "employees who signed authorizations during the last year of the contract could revoke their authorizations upon the expiration of that contract." *Id.*

The ALJ later reiterated the same conclusion when responding to the suggestion that the authorizations were ambiguous. He said he had "already concluded the authorizations were sufficiently clear to allow each employee who signed an authorization during the 2003-2008 contract the opportunity to revoke the authorization during the window periods preceding the yearly anniversary date that the employee signed the authorization." *Id.* at 708. "In addition," those "employees who signed authorizations during the last year of the contract could revoke their authorizations upon the expiration of that contract." *Id.* Other employees thus had no revocation opportunity tied to the contract's expiration.

Even though the ALJ unambiguously (and twice) set out his understanding that only certain employees—those who signed authorizations in the bargaining agreement's last year—had received any revocation opportunity tied to the

agreement's expiration, our dissenting colleague perceives the ALJ to have determined otherwise. Dissent 2-4. According to the dissent, the ALJ in fact concluded that all employees had a 15-day window preceding the contract's expiration within which to revoke their authorizations. As the dissent sees it, the ALJ ostensibly indicated that belief in the final paragraphs of his opinion, in the midst of a closing section explaining his refusal to consider an argument the Board's General Counsel sought to make for the first time—viz., that the checkoff authorizations were facially invalid in failing to provide for a revocation opportunity tied to the bargaining agreement's expiration. To show that the General Counsel had made no such argument until that point, the ALJ quoted the General Counsel's oral statement at trial as follows: "And at trial while discussing with me the window period prior to the expiration of the contract, the General Counsel conceded: 'Well, I think both parties agree that during the 15 day period before October of 2008 that the parties could revoke. . . . I'm not arguing that.'" *Smith's Food & Drug*, 358 NLRB at 709. The General Counsel, that is, had previously said he was "not arguing" the very thing he now sought to argue.

The ALJ thus quoted the General Counsel's prior statement to demonstrate that the General Counsel's new facial-validity argument stood at odds with his previously stated position, and so would not be considered. In the view of our dissenting colleague, however, the ALJ, in referencing the General Counsel's statement, effectively made a finding endorsing the statement. Dissent 2-3. We do not see how that could be the case. If the ALJ in fact aimed to determine that all employees had a 15-day revocation window before the contract's expiration, let alone do so through the circuitous route of referencing the General Counsel's oral statement, then why would the ALJ—when directly expounding his understanding of the revocation opportunities granted to the

company's employees—twice describe the employees who had a revocation opportunity tied to the contract's expiration as limited to those employees who signed their authorizations in the contract's last year? Why single out those employees alone for mention? The answer is plain: the ALJ believed those were the only employees who in fact had been granted a revocation opportunity tied to contract's expiration, regardless of any suggestion otherwise by the parties (including the Union, *see* Dissent 2). Indeed, the ALJ's determination to that effect is only reinforced by his quotation of the General Counsel in the opinion's final paragraphs: although the ALJ was aware of (and took note of) the General Counsel's statement that all employees had a revocation opportunity tied to the contract's expiration, the ALJ twice explained that such an opportunity was confined to those employees who had signed an authorization in the contract's last year.

On that understanding, the facts in this case differ meaningfully from those in *Frito-Lay*. In *Frito-Lay*, a revocation window tied to the collective-bargaining agreement's expiration was available to all employees, which the Board considered significant in finding no inconsistency with Section 302(c)(4). Here, by contrast, the ALJ found that employees generally lacked any revocation opportunity associated with the contract's expiration. To be sure, the ALJ found that *some* employees—those who executed a checkoff authorization in the contract's final year—could revoke their authorizations at the time of the contract's expiration. But nothing in *Frito-Lay* purports to speak to a situation in which only those employees who sign authorizations in a contract's final year are afforded a revocation opportunity tied to the contract's expiration. In fact, the Board confirmed in its brief in this case that none of its decisions (including *Frito-Lay*) affirmatively addresses that situation: it observed that it "has had no occasion to pass on whether a revocation period at the

expiration of a bargaining agreement can be limited to those who sign authorizations during the last year of [the] agreement." NLRB Br. 31 n.8. The Board itself thus disclaims any suggestion that *Frito-Lay* governs on the facts of this case as understood by the ALJ. (The Board's statement, it bears noting, also undermines the dissent's protestation, Dissent 3-4, that "[i]t has never been asserted by anyone" that employees could permissibly be denied both a pre-expiration revocation window and a post-expiration revocation opportunity—the Board pointedly sought to preserve that exact possibility in its brief in this case.)

Although the Board advises that none of its decisions speaks to the proper result on the facts here as understood by the ALJ, the ALJ decided the case against petitioners on the belief that *Frito-Lay* squarely controls. The ALJ reasoned that, in *Frito-Lay*, "the Board rejected the notion that employees are free to revoke their checkoff authorizations at will during the hiatus period between contracts." *Smith's Food & Drug*, 358 NLRB at 707. The ALJ then assumed that petitioners likewise could have no such entitlement. *Id.* But *Frito-Lay* reached that conclusion in a situation in which employees had a revocation opportunity tied to the bargaining agreement's expiration (which *Atlanta Printing* had previously said was required). There was no such opportunity for petitioners in this case, per the ALJ's understanding.

The ALJ's belief that *Frito-Lay* straightforwardly compels a ruling against petitioners must also be imputed to the Board. The Board summarily affirmed the ALJ's decision. In doing so, the Board did not reject the ALJ's understanding that petitioners and other employees generally lacked any revocation window tied to the bargaining agreement's expiration. Nor did the Board reject the ALJ's treatment of this case as a routine application of *Frito-Lay*.

Rather, the Board expressly endorsed the ALJ's rulings, findings, and conclusions. The Board's decision therefore necessarily rests on the same flawed premise as the ALJ's—that *Frito-Lay* directly controls this case.

In oral argument, the Board's counsel drew attention to a footnote in the Board's summary affirmance of the ALJ, in which the Board stated:

> In adopting the [ALJ]'s dismissal of the complaint, we note that (a) the Acting General Counsel does not contest the facial validity of the Respondent Union's standard dues-checkoff authorization agreement, and (b) there is no evidence that any of the Charging Parties attempted to revoke—or even inquired about revoking—their authorizations during any of the possible window periods. We thus find it unnecessary to pass on the Respondent Union's contention that we should give deference to its interpretation of the language of the authorization agreement.

*Id.* at 704 n.2.

That footnote did not somehow transform a non-*Frito-Lay* case into a *Frito-Lay* case. Whatever may be the footnote's precise meaning, it does not reject the ALJ's factual understanding that the employees had no revocation opportunity tied to the bargaining agreement's expiration. At best, the Board thought "it unnecessary to pass on" the Union's interpretation of the authorizations, thereby leaving the ALJ's understanding in place for our purposes. The bottom line, then, is this: the facts as found by the ALJ (and as left undisturbed by the Board) take this case outside the sphere of *Frito-Lay*, yet the rationale of the ALJ (and thus of

the Board in its summary affirmance) treats the case as squarely controlled by *Frito-Lay*.

When an agency's decision cannot be sustained by the rationale on which it rests, we must set it aside. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). Perhaps the Board applied *Frito-Lay* based on a mistaken assumption that the facts here are no different. Or perhaps the Board applied *Frito-Lay* based on a mistaken belief that the decision directly controls notwithstanding the significant factual difference. Either way, the Board's treatment of this case as a routine application of *Frito-Lay* cannot be squared with the rationale of that decision. And this court "cannot uphold a decision where an agency departs from established precedent without a reasoned explanation." *LePage's 2000, Inc. v. Postal Regulatory Comm'n*, 642 F.3d 225, 234-35 (D.C. Cir. 2011).

The Board's footnote might be seen to suggest one other possible rationale for its decision. In noting the absence of any dispute about the "facial validity" of the checkoff authorizations, the Board perhaps hinted at a belief that the particular way in which the challenge was brought before it— i.e., as something other than a dispute about "facial validity"—bore in some way on the applicability of *Frito-Lay*. But it is far from clear why that should be so; and more importantly, the Board gave no clear indication in its decision that it was adopting any such theory. A court cannot "be expected to chisel that which must be precise from what the agency has left vague and indecisive." *Chenery*, 332 U.S. at 197. In any event, the Board's briefing before us makes no attempt to explain (or defend) its decision along these lines, leaving us unable to understand the Board's decision in a way the Board itself does not urge.

Rather, the Board defends its decision on the assumption that this is a *Frito-Lay* case, and on the theory that *Frito-Lay*

was correctly decided. The assumption, for all the reasons explained, is incorrect—this is not a *Frito-Lay* case. We therefore vacate the Board's decision and remand the case to the agency. On remand, insofar as the Board might seek to reinstate the same result in favor of the company and union, the Board would need to explain how it could do so consistently with *Frito-Lay* and *Atlanta Printing* or justify any departure from those decisions.

We note, finally, that our disposition renders it unnecessary to address the union's objection to our consideration of the ultimate correctness of the Board's decision in *Frito-Lay*. The union contends that, when the Board's General Counsel brings a complaint before the agency, we cannot entertain challenges to the Board's decision that deviate from arguments made by the General Counsel before the agency. *See* 29 U.S.C. § 153(d). Here, the union submits, we cannot consider petitioners' challenge to *Frito-Lay*'s consistency with Section 302(c)(4) because the General Counsel assumed *Frito-Lay*'s validity. We have no occasion to consider the union's objection to our consideration of petitioners' challenge to *Frito-Lay*: because we conclude that the Board's decision cannot be sustained as an application of *Frito-Lay*, we do not reach the merits of petitioners' challenge to that decision.

### B.

Having disposed of petitioners' *Frito-Lay* challenge in that fashion, we turn briefly to their second challenge to the Board's decision—i.e., that their resignations from union membership during the hiatus period should have caused the company and union to cease checking off their union dues. The Board's precedents hold that, when the language of a checkoff authorization "clearly set[s] forth an obligation to

pay dues even in the absence of union membership," an employee "has bound himself or herself to pay the dues even after resignation of membership." *Lockheed*, 302 NLRB at 219. In that situation, resignation from the union will not itself effect revocation of a checkoff authorization.

Petitioners do not challenge the principle established in *Lockheed*; nor do they dispute that the checkoff authorizations in this case indicated with adequate clarity that their resignations from union membership would not automatically negate their checkoff authorizations. Petitioners instead present what they perceive to be a distinct argument. They contend that, when they resigned their union membership, the company and union were required to cease checking off their union dues in the next available revocation period. And the next available period was already at hand, petitioners argue, because, under their *Frito-Lay* challenge, they had an at-will entitlement under Section 302(c)(4) to revoke their checkoff authorizations during the hiatus between bargaining agreements. Petitioners' argument in this regard, by its own terms, depends on their having prevailed on their *Frito-Lay* challenge: according to petitioners, if they had an at-will entitlement to revoke their authorizations during the contract hiatus per that challenge, then their resignations during the hiatus should have led to an immediate cessation of the checkoff of their dues.

Because petitioners would have already prevailed under their first argument before their second one comes into play, it is unclear what, if anything, petitioners independently stand to gain from their second argument. Regardless, their second argument is contingent on (and overlaps with) their first to an extent that our vacatur and remand as to their first argument counsels in favor of the same disposition as to the second argument as well. On remand, if the Board ultimately

concludes that petitioners had an entitlement to revoke their checkoff authorizations during the contract hiatus for purposes of their *Frito-Lay* challenge, the Board can then assess whether there is any need to address petitioners' argument based on their resignations.

* * * * *

For the foregoing reasons, we vacate the Board's decision and remand the case to the agency for further proceedings consistent with this opinion.

*So ordered.*

SILBERMAN, *Senior Circuit Judge,* dissenting: This case is a hot potato. It is a straightforward dispute over the proper interpretation of a criminal statute, section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, and the relationship between that statute and section 8 of the National Labor Relations Act, *id.* § 156. The question is: Does the criminal statute mean employees have a legal right to revoke dues checkoff authorizations after the termination of an "applicable collective bargaining agreement"? Or can a union frustrate that right by providing only a "window period" for revocation before termination? The majority opinion avoids answering the question – presented by all parties – by purporting to discover an ambiguity in the Board's opinion that none of the parties perceived, and I do not believe exists, thereby justifying a remand.

To be sure, there is an ambiguity in the case, i.e., the dues checkoff authorization cards signed by grocery store clerks are ambiguous:

> This authorization and assignment is voluntarily made in consideration for the cost of representation and collective bargaining and is not contingent upon my present or future membership in the Union. This authorization and assignment shall be irrevocable for a period of one (1) year from the date of execution or until the termination date of the agreement between the Employer and Local 99, whichever occurs sooner, and from year to year thereafter, unless not less than thirty (30) days and not more than forty-five (45) days prior to the end of any subsequent yearly period I give the Employer and Union written notice of revocation bearing my signature thereto.

*Smith's Food & Drug Ctrs. Inc.*, 358 NLRB 704, 706 (2012).

It is not clear from the text of the authorization whether the subsequent year-to-year period of irrevocability runs from the date of the expiration of the first year or the termination date of the contract, and also whether the window period – during which an employee can revoke – precedes the anniversary date or the expiration of the agreement, or both.

Indeed, the General Counsel claimed that the checkoff forms were ambiguous, but the ALJ rejected that claim. The ALJ said the authorizations were "sufficiently clear" to allow each employee who signed an authorization during the 2003-2008 contract the opportunity to revoke that authorization during the window periods preceding his or her anniversary date. *Id*. at 708. He then wrote a sentence while examining the authorization cards upon which the majority rests its entire opinion: "In addition, employees who signed authorizations during the last year of the contract could revoke their authorizations upon the expiration of th[e] contract." *Id*. The majority concludes that because in that sentence the ALJ neglected to mention a window period before the termination of the contract, he implicitly found there was no additional window period before the contract terminated – and therefore the main issue presented by the parties is not really before us. If there was no window period before the termination of the contract, under Board doctrine, employees would clearly have a right to revoke their authorization at will during the hiatus, after termination of the contract.

There is a very good reason why none of the three parties before us discovered this anomaly in the Board's decision – it does not exist. At trial, the union representative confirmed there was "a window period 30 to 45 days prior to the anniversary date of signing it *and prior to the expiration of the contract*." (emphasis added). The ALJ endorsed this understanding of the

pre-termination window periods later in his opinion, making absolutely clear that there was – as a matter of practice – a window period before the expiration of the contract.  He said, "And at the trial *while discussing with me the window period prior to the expiration of the contract*, the General Counsel conceded: 'Well, I think both parties agree that during the 15 day period before October of 2008 that the parties could revoke.'" *Id*. at 709 (emphasis added).  In other words, although the authorization cards could be read as omitting a window period prior to expiration of the contract, as the ALJ had earlier noted, the parties actually interpreted the authorization as providing a window period of 15 days before termination of the contract, and therefore the ALJ recognized the pre-termination window period existed.   No party challenged that factual proposition.  Indeed, the Board's brief states that the Board "has had no occasion to pass on whether a revocation period at [before] the expiration of a bargaining agreement can be limited to those who sign authorizations during the last year of a bargaining agreement."  Yet that is exactly the issue the majority believes this case presents.  But that is not the Board's view.  In sum, the very premise of the majority opinion is – I am almost reluctant to say – absolutely false.  It is entirely made up.

If the majority were correct and somehow all the parties to this case misunderstood the ALJ's opinion – i.e., employees who signed authorization cards before the last year *were* entitled to revoke at termination because there was no window period for them – then there would be no possible reason why the ALJ would not have granted employees in that category relief under longstanding Board doctrine.  *See Atlanta Printing Specialties*, 215 NLRB 237 (1974), *enf'd*, 523 F.2d 783 (5th Cir. 1975).  It has never been asserted by anyone, the parties to this case, the Board, nor any court, that under section 302 employees can be denied an opportunity to revoke authorization cards after

termination of an applicable collective bargaining agreement if there is no pre-termination window period. In other words, the only ground that can be advanced – and I think it is a gimmick – to deprive an employee of a right to revoke after termination is a window period. *See Frito-Lay*, *Inc.*, 243 NLRB 137 (1979). In an effort to find an ambiguity in the ALJ's opinion – a pearl in the oyster – the majority attributes to the ALJ an absurd position. It is not a pearl the majority has found; it is a piece of sand.

The ALJ (and the Board[1]), without the majority's creative assistance, understood it was required to face the question whether under section 302 employees had an absolute right to withdraw their authorization after termination of the contract, during the hiatus period before a new contract was signed. *See* 29 U.S.C. § 186(c)(4). (All parties agree that the series of interim agreements have no legal significance.) To that question, the ALJ had an easy answer. The Board decided that question years ago in *Frito-Lay*. *Smith's Food & Drug Ctrs.*, 358 NLRB at 707 (citing *Frito-Lay*, 243 NLRB at 144). The Board had held that so long as a union's authorization cards provided a window period before the expiration of a collective bargaining agreement, employees did not have an additional right to revoke their authorization at the termination of the agreement. *See Frito-Lay*, 243 NLRB at 138.

---

[1] The Board adopted the ALJ's dismissal of the complaint. It implicitly recognized that the authorization cards were ambiguous by noting that "the Acting General Counsel does not contest the facial validity of the Respondent Union's standard dues-checkoff authorization agreement." *Smith's Food & Drug Ctrs*., 358 NLRB at 704 n.2.

The Board in *Frito-Lay* – as it does before us – read the crucial language in section 302 giving an employee a right to revoke a checkoff authorization "*beyond* the termination of the applicable collective bargaining agreement" as satisfied by giving employees a window period *before* the termination of an applicable agreement. *See id.* The difference between a right to revoke during a limited pre-termination window and a right to revoke at will upon termination of an agreement is not an insignificant difference. Employees might well decide to revoke their authorizations, as in this case, only *after* termination of an applicable agreement, because of the then-existing unsatisfactory status of relations between the union and employer.

The Board has a rather peculiar position regarding the legal effect of section 302(c)(4) on its application of the National Labor Relations Act. It recognizes that illegal checkoffs – i.e., payments to the union without employee authorization – would violate section 8 of the Act. *See, e.g.*, *id.* at 137. But in deciding whether a checkoff authorization with a window period before termination of a contract satisfies section 302(c)(4), it does not consider itself actually bound by section 302 – though even the Board does not claim it may ignore section 302 completely. *See id.* at 138 (quoting *Salant & Salant, Inc.*, 88 NLRB 816, 817-18 (1950)).

I think that it is an untenable position. Section 302 clearly represents Congressional policy on the legality of checkoff authorizations, even though it is expressed in a companion criminal statue. In an analogous case, the Supreme Court rejected an interpretation of the Sherman Act in a criminal proceeding because it was in tension with a later civil statute, the Norris-LaGuardia Act. *See United States v. Hutcheson*, 312 U.S. 219, 231-35 (1941). The Court reasoned that Congress had

expressed its policy view as to the legality of a union's conduct in the Norris-LaGuardia Act. Here too, the interplay between the criminal and civil provisions of related statutes means there must be a consistent understanding as to which checkoff practices are lawful and which are not, or else employers are exposed to conflicting obligations. The Board's interpretation of section 8 of the NLRA cannot be in direct opposition to section 302's criminal prohibition. *See BASF Wyandotte Corp.*, 274 NLRB 978, 979 (1985), *enf'd*, 798 F.2d 849 (5th Cir. 1986).

Even assuming that section 302 does affect the proper interpretation of the NLRA, the Board argues that it is entitled to deference when it "looks" at section 302 and determines how it fits into that statute. Of course, it is axiomatic that the Board does get deference when it interprets ambiguous language in the NLRA under *Chevron*. *See, e.g.*, *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992). That deference flows from Congress's delegation to the Board to enforce that Act. But it is also a fundamental principle of administrative law that an agency does not get deference interpreting a statute if another body has responsibility to interpret the same language. *See Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003); *Wachtel v. Office of Thrift Supervision*, 982 F.2d 581, 585 (D.C. Cir. 1993). That is particularly true if the other body is a federal court. *Cf. Litton Fin. Printing v. NLRB*, 501 U.S. 190, 202-03 (1991) (citing *Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB*, 797 F.2d 1027, 1030-31 (D.C. Cir. 1986)).

Moreover, there is yet another reason for withholding deference in this case. After all, section 302 creates criminal liability. *See NLRB v. Oklahoma Fixture Co.*, 332 F.3d 1284, 1291 (10th Cir. 2003) (Briscoe, J., concurring). *See generally Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1027 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part), *cert.*

*granted*, 137 S. Ct. 368 (2016). To be sure, the Justice Department has not so far prosecuted an employer or union for refusing to permit an employee to revoke an authorization at the termination of an "applicable contract" if the contract contained a window period, but that is a matter of prosecutorial discretion and certainly does not bind an existing or future Justice Department.

That brings me to the merits of the statutory interpretation question, and I do not regard it as difficult. The Board adopts an anti-textual interpretation of the phrase, "beyond the termination." It essentially claims that "beyond" can mean "before"; if an employee's authorization card conferred a window period in which to revoke authorization before the termination date and he or she does not revoke, he or she has forfeited the right after termination of the contract. In this case, that means petitioners who sought to revoke their authorization during the hiatus period after termination of the applicable agreement in October 2008 were not entitled to revoke, and therefore Fry's and Local 99 did not commit an unfair labor practice by refusing to accept revocations submitted during that period. I think the Board's interpretation of section 302 is flatly wrong, as have other courts that have considered the issue.[2] The Board has engaged in a blatant attempt to rewrite a statute in which Congress spoke plainly – at least on the crucial issue.

---

[2] *See Anheuser-Busch, Inc. v. Int'l Bhd. of Teamsters*, 584 F.2d 41, 43 (4th Cir. 1978); *Murtha v. Pet Dairy Products Co.*, 314 S.W.2d 185, 190 (Tenn. 1957). *Associated Press v. NLRB*, 492 F.2d 662 (D.C. Cir. 1974), is not to the contrary. In that case, we did not interpret section 302(c)(4) but simply affirmed the Board's deferral to an arbitrator. *Id*. at 667.