# FRANCIS J. MURTHA, Trustee, et al. v. PET DAIRY PRODUCTS COMPANY. —314 S. W. (2d) 185.

Eastern Section. December 11, 1959.

Rehearing denied February 27, 1958.

Certiorari denied by Supreme Court June 6, 1958.

462

S. J. Milligan, Greeneville, Ferdenand Powell, Jr., Johnson City, for appellants.

John S. McLellan, Kingsport, for appellees.

HOWARD, J. The complainants herein, Francis J. Murtha, as Trustee, Kenneth C. Sackmann, as Secretary-Treasurer and Business Manager, and W. H. Thompson, as President and Business Representative, individually and as representatives of the membership of Local Union

No. 23, sued the defendant, Pet Dairy Products Company, a Corporation organized under the laws of the State of Delaware, with its principal office in Johnson City, Tennessee, to enforce the provisions of a collective bargaining contract which was entered into between said Local and the defendant Corporation, the said Local having been certified as the collective bargaining representative by the National Labor Relations Board.

The defendant has been engaged in the manufacture, production and distribution of dairy products for several years, and for this purpose has maintained plants in the States of Kentucky, West Virginia, Virginia, North Carolina, South Carolina, Georgia and Tennessee.

The office of Local No. 23, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, is located in Johnson City, Tennessee, and its membership consists solely of employees of the defendant, estimated at 1015.

For several years previous to August 1, 1955, it appears that the labor relations between the Company and the Local had been harmonious, that the Company had encouraged its employees to join the Union, and from time to time had entered into collective bargaining contracts with the Local. These contracts provided, among other things, that upon an employee signing and filing with the Company a proper "check-off authorization and assignment," the Company would deduct from said employee's first pay check each month his Union dues, etc., and would on or before a specified date remit same to the Local.

On September 3, 1954, the parties entered into a written contract for the period of one year from June 1, 1954, to May 31, 1955, after which, about July 15th, they orally agreed to continue in effect "all the provisions of the old contract" until a new contract could be negotiated, Article 1, Section 4 of said written contract providing:

"The Employer agrees to deduct from the pay of all employees covered by this agreement dues, initiation fees and/or uniform assessments of the Union having jurisdiction over such employees and agree to remit to said Union all such deductions. Where laws require written authorization by the employees, the same is to be furnished by the Union in the form required. No deduction shall be made which is prohibited by applicable law. Dues to be deducted shall be four dollars ($4.00) and shall remain at this amount until the majority shall vote otherwise."

It was agreed that approximately all of the Company's employees were members of the Local prior to May 31, 1955, and that each employee had, prior thereto, signed and filed with the Company the following form of check-off authorization furnished by the Local:

"International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers Local No. 23

Check-Off Authorization and Assignment

"I, the undersigned member of Local 23 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, herewith authorize my employer to deduct from my wages

each and every month my union dues consisting of initiation fees, monthly fees and uniform assessments owing to such Local Union as a result of membership therein, and direct that such amounts so deducted be sent to the Secretary-Treasurer of such Local Union for and on my behalf.

"This authorization and assignment shall be irrevocable for the term of applicable contract between the Union and the Company, or for one year, which ever is the lesser, and shall automatically renew itself for successive yearly or applicable contract periods thereafter, whichever is the lesser, unless I give written notice to the Company and the Union at least 60 days and not more than 75 days before any periodic renewal date of this authorization and assignment of my desire to revoke the same.

"Signed————————————

"Witness:

"———————————— Date————————————"

It was further agreed that following May 31, 1955, the Company continued to comply with Section 4 of the 1954-55 contract until the latter part of July 1955, when it started receiving written notices from certain employees revoking their check-off authorizations, and of their resignations from the Union. Subsequently these revocations increased during the months of August, September, October and November 1955, until they totaled approximately 252, the largest number being from the Plant located at Greenville, South Carolina. The Company, over the Union's protest, honored the revocations of these employees, and thereafter discontinued deducting their Union dues, etc.

On October 27, 1955, a new contract was executed by the parties for the period from October 1, 1955, to September 30, 1957, and by Article 1, Section 4 of this contract it was provided:

"The Company agrees to deduct from the first pay check each month of each employee who is a member of the Union, dues, initiation fees, and/or uniform assessments of the Union and agrees to remit to the Union all of such deductions on or before the 20th day of each month, provided the employees have filed proper written authorization for such a check-off. No deduction shall be made which is prohibited by applicable law. Dues to be deducted shall be four dollars ($4.00) and shall remain at this amount until the majority of the Union members shall vote otherwise at a duly called meeting."

After the contract was executed on October 27, 1955, it appears that the Company complied with the above Section as to all employees except the 252 who had revoked their authorizations. As to these employees, the Company refused to further deduct Union dues, etc., from their wages, and to enforce the provisions of the above Section, the bill herein was filed on January 16, 1956.

The bill alleges in substance that prior to July 1, 1955, the Company, pursuant to check-off authorizations signed by employees and Article 1, Section 4 of the 1954-55 collective bargaining agreement, deducted employees' Union dues, etc., and remitted same to the Local as therein provided; that beginning the latter part of July, 1955, and continuing to the date of the filing of the bill herein, certain employees who were members of the Local attempted to withdraw and revoke their check-off authori-

zations contrary to the terms thereof, and that the defendant, by honoring these revocations, violated Article 1, Section 4 of the collective bargaining agreements; that said attempted revocations were not terminated in conformity with the terms of the authorization in that notice of the purported cancellations were not given "to the Company and the Union at least 60 days and not more than 75 days before any periodic renewal date" of such authorization and assignment.

■ For relief the bill prayed (1) that the purported revocations by the 252 employees be adjudicated as null and void, (2) for a decree for $3,440, the total amount of unpaid Union dues which the Company had refused to withhold under its contract; (3) for temporary injunction for specific performance of the contract, and (4) that the temporary injunction, upon the hearing, be made permanent.

By amendment allowed on June 16, 1956, it was averred "that defendant, through its agents, representatives and servants, did in fact procure the breach of the 'Check-off Authorizations and Assignments,' which are the subject of this Bill of Complaint, thus subjecting it to treble damages," as provided by T. C. A. sec. 47-1706, and the amount sued for was increased from $3,440 to $8,544, the alleged amount then due, plus treble damages, or a total of $25,632.

Answering, the defendant expressly denied that it had breached either of its contracts with the Local, averred that the 252 revocations by employees were valid, and in addition thereto specifically plead other defenses.

■ Upon the hearing, which was on oral testimony, the Chancellor sustained the bill in all respects, and from a

decree awarding the Local $20,140 actual damages, and $40,280 as treble damages, or a total of $60,420 and all costs, the defendant perfected a broad appeal to this Court where, under our procedure, the record, consisting of more than 900 pages, is reviewable de novo. T. C. A. sec. 27-303.

On behalf of the defendant it is contended that the three named complainants, Murtha, Sackmann and Thompson, being neither members nor ''proper officers'' of the Local, had no authority to maintain the suit herein individually or as a class action, and that the Chancellor erred in holding to the contrary.

The proof showed that both Sackmann and Thompson were members in good standing of the Local, and that they and the other co-complainant Murtha, Trustee, who was an official of the International Brotherhood, were recognized by the Company as the Local's acknowledged bargaining representatives for more than 2 years before suit herein was filed. They negotiated the two contracts in question, both of which were signed by Sackmann and Thompson as officers of the Local. Under these circumstances, the defendant having acknowledged the complainants' authority to negotiate and execute the contracts, the defendant would now be estopped from denying their authority to enforce them.

Nor were the 252 employees who revoked their check-off authorizations necessary parties to the suit, as insisted. The bill simply seeks to recover damages from the Company for breach of its contracts, and seeks no relief whatsoever against said employees. See Gibson's Suits in Chancery, 4th Ed., Sec. 93, pp. 115, 116. Moreover, making the employees parties to the suit, either by

bill or cross-bill, would only further complicate an already complicated law suit.

Next it is contended that the Company had no authority to further deduct Union dues of the 252 employees after they had resigned therefrom and revoked their authorizations; that by Article 1, Section 4 of the two contracts, as well as by the terms of the authorization, deduction of Union dues was expressly made conditional upon "membership therein," and that Union membership being purely voluntary, was terminable at will, upon payment of all accrued charges.

It is apparent from the history of their contractual relations that both the Company and the Local had for several years been complying with Sec. 302(c) (U.S.C.A. Title 29, sec. 186) of the Labor Management Relations Act. By this Section an employer is specifically prohibited from paying money or delivering other things of value to a labor organization, but expressly excepts therefrom voluntary check-offs where there are collective bargaining agreements on the following conditions:

"Provided, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner."

As will be observed, the Act authorizes assignments or check-offs irrevocable for periods of one year, or until the termination date of the applicable collective bargaining agreement, whichever occurs sooner, and a provision in the authorization for automatic renewal

for successive like periods has been approved generally. No prohibition exists against check-offs revocable at will, and the Act is silent as to contracts of indefinite duration.

"A checkoff of union dues has been held to be an appropriate matter to be covered by a collective bargaining agreement, and a provision for a checkoff has been held to be valid and enforceable. Where an employee's agreement authorizing his employer to deduct union dues from his wages is indefinite as to time, it is revocable at will, and a deduction made after revocation is unauthorized." 56 C. J. S. Master and Servant sec. 103, b, p. 535.

In the instant case, the check-off authorization form furnished by the Local makes special reference to the term of the applicable contract between the Local and the Company, as follows:

"This authorization * * * shall be irrevocable *for the term of the applicable contract,* * * * or for one year, whichever is the lesser, and shall automatically renew itself for successive yearly or *applicable contract periods thereafter,* whichever is the lesser, until I give written notice to the Company and the Union at least 60 days and not more than 75 days *before any periodic renewal date* * * * of my desire to revoke same." (Emphasis supplied.)

■ Of the 252 employees who revoked their authorizations, 234 occurred during the 5 months period between May 31, 1955, the expiration date of the 1954-55 contract, and October 27, 1955, the date the new contract was executed. During this period the parties were operating under the terms of the 1954-55 contract, which by

agreement was extended until a new contract could be negotiated, a date undeterminable at the time. These 234 revocations were previous to the date of the new contract, and any attempt to make its provisions applicable to them would be ineffective. Nor during said period could these employees give the advanced notice of revocation as required by the terms of the authorization, because they were unable to determine either the "termination date" of the verbal agreement, or the "periodic renewal date" of the new contract, and the law does not require the impossible. The Labor-Management Relations Act authorizing check-offs, also fixes a date for termination. Otherwise, the purposes of the Act would be nullified. In the instant case, neither of the above fixed dates for revocation being ascertainable, we are of the opinion that authorizations were, during said period, revocable at will, and that the Company subsequently had no authority to further deduct Union dues, etc., from wages of the 234 employees. 56 C. J. S. Master and Servant sec. 103 b, p. 535; Fisher v. Stevens Coal Co., 143 Pa. Super. 115, 17 A. (2d) 642. Had these employees waited until after the new two-year contract was signed on October 27th, as did the remaining 18 employees, their attempt to revoke their authorizations for the irrevocable period of "one year" would have been ineffective.

"Employees are entitled to know, and presumably it was intended by Congress and the parties to this agreement that they should know, with a reasonable degree of certainty, when the agreement was to terminate. The right to revoke a wage assignment authorization must depend upon a known or reasonably ascertainable termination date. An employee cannot freely exercise the right to revoke unless the

472

'termination date' is set at a definite time or is a definite date known to the employees. Thus if * * * the agreement is to have meaning and be effective to the employee, it must be interpreted in such a way as to present to the employees a reasonably fixed date of termination." In re Metropolitan Life Insurance Company and Insurance Workers of America, June 27, 1957, 28 LA 888.

Accordingly, it is our judgment that the 234 revocations were valid, and the decree of the learned Chancellor insofar as it relates to them will, in all respects, be reversed.

We now consider the legal status of the remaining 18 employees whose notices of revocation were received and honored by the Company after October 27, 1955, the date of the new contract.

Prior to and on said date, these employees were members of the Union. They had previously signed and filed with the Company authorizations providing for automatic renewals. These authorizations were irrevocable for the term of the applicable contract, or for one year, whichever occurred sooner, and were by specific reference made an integral part of the agreement. By Article 1, Section 4 of the contract, the Company agreed to deduct from the first paycheck each month of each employee who is a member of the Union, dues, etc., and remit same to the Union, "provided the employees have filed proper written authorization of such a check-off." Thus, the conditions of Section 4 had been met, and the Company was under a contractual duty to comply with its provisions for the effective period of the authorizations.

A review of authorities elsewhere shows that check-off authorizations for Union dues in collective bargaining contracts for future periods have been approved generally. N. L. R. B. v. Clinton Woolen Mfg. Co., 6 Cir., 141 F. (2d) 753; Southern Pac. Co. v. Switchmen's Union of N. America, D. C., 138 F. Supp. 919; Pacific Mills v. Textile Workers' Union, 197 S. C. 330, 15 S. E. (2d) 134, 135 A. L. R. 497; Sanford v. Boston Edison Co., 319 Mass. 55, 64 N. E. (2d) 631; Hotel & Restaurant Employees, International Alliance v. Greenwood, 249 Ala. 265, 30 So. (2d) 696; Greenwald v. Chiarella, 271 App. Div. 213, 63 N. Y. S. (2d) 49; Annotations, 14 A. L. R. (2d) 177; 35 A. L. R. 507.

Nor do we find any merit in the contention that the authorizations were invalid, because they were for unearned wages and not assented to in writing by the Company, as required by T. C. A. sec. 50-315.

█ It seems to us that when the applicable collective bargaining agreement was signed with the Local on October 27, 1955, the Company by implication accepted the authorizations which had been signed by employees who were members of the Local at that time. This was, at least, a substantial compliance with the requirements of the Statute. Also, a party will not be heard to take a position inconsistent with his admitted previous course of conduct. Gibson's Suits in Chancery, 4th Ed., Sec. 67, p. 84; 31 C. J. S. Estoppel secs. 108, 113, pp. 341, 362; 19 Am. Jur. Sec. 62, p. 676. Here the Company had not only previously posted notices at its several plants encouraging employees to execute the authorizations, but during the trial admitted honoring authorizations of employees who were then members of the Local.

■■ Finally, to support a recovery for treble damages under T. C. A. sec. 47-1706, two contracts are necessary, namely, a contract between the Company and the Local, and a contract between the Union and its members by which they agree to pay the Local. In the first instance the Company was only obligated to deduct Union dues under certain conditions, and the statute has no application where one party to a contract fails to perform his part, and in the second instance there being no contract between the Local and the members, the statute would likewise be inapplicable. Furthermore, there was no proof whatsoever that the Company persuaded or procured any of the 18 revocations, after the new contract was executed on October 27, 1955.

Accordingly, the decree below will be affirmed except as to treble damages and dues of the 234 employees. As to these two items, the decree will be reversed. If for any reason the parties cannot agree upon the total amount of dues the Company should have deducted for the 18 employees, then the case will be remanded for the taking of proof thereupon.

As modified, the decree will be affirmed and the costs of the cause will be taxed equally between the Local and the Company.

McAmis, P. J., and Hale, J., concur.

On Petitions to Rehear.

Howard, Justice.

■ Petitions have been filed herein by both sides, the Union respectfully seeking a rehearing, and the Pet Dairy Products Company respectfully calling attention to our failure to consider its assignment of error relating

to the permanent injunction ordering specific performance of the collective bargaining contract by the Company.

In the Union's petition no questions are raised which have not heretofore been considered and determined, and the petition is denied.

Though we did not consider the question called to our attention by the Company's petition, we deemed it unnecessary for the following reasons:

According to its terms, the contract upon which the suit is predicated expired on September 30, 1957. The case was argued before the Bar of this Court on September 13, 1957, and the opinion was filed on December 5th following. Meantime the contract had expired rendering the question of specific performance moot.

Assuming, however, that the question is not moot, and anticipating that the parties might wish to rely thereupon on appeal, we have decided to respond to the Company's assignment of error and petition.

As pointed out in the original opinion the suit is for damages predicated upon breach of contract and obviously, the Company being solvent, a monetary decree would not only be adequate, but complete.

█ The rule is well settled that where damages are practicable, as here, and would be adequate, as here, the Court as a rule will not decree specific performance. Vol. II, Gibson's Suits in Chancery, 5th Ed., Sec. 995, p. 237; 81 C. J. S. Specific Performance sec. 6, p. 414. Accordingly, that portion of the decree awarding specific performance is vacated.

McAmis, P. J., and Hale, J., concur.