NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ATLANTA PRINTING SPECIALTIES
AND PAPER PRODUCTS UNION
527, AFL–CIO, Respondent.

No. 75–1566.

United States Court of Appeals,
Fifth Circuit.

Nov. 20, 1975.

Elliott Moore, Deputy Assoc. Gen.
Counsel, John D. Burgoyne, N.L.R.B.,
Washington, D.C., Walter C. Philips, Director, Region 10, N.L.R.B., Atlanta, Ga.,
for petitioner.

J. R. Goldthwaite, Jr., Atlanta, Ga., for
respondent.

784

Before BELL, THORNBERRY and MORGAN, Circuit Judges.

BELL, Circuit Judge:

The National Labor Relations Board has petitioned this court for enforcement of its order requiring the union to cease and desist from causing an employer not to honor employees' timely revocation of dues checkoff authorizations and ordering the union to reimburse the employees for the improperly withheld dues, plus interest.

■ Adopting the findings of the Administrative Law Judge, the Board held that even though the union and employer had prematurely extended their collective bargaining agreement to a new expiration date, the employees had a statutory right to revoke their dues checkoff authorizations at the original expiration date of the collective bargaining agreement. Therefore, revocations tendered during the escape period at the original expiration date were timely, and the union's causing the employer not to honor them was an unfair labor practice in violation of Sections 8(b)(1)(A) and (2) of the National Labor Relations Act.[1] We agree and grant enforcement of the Board's order.

## I. The Facts

Since 1963 the union and the employer, The Mead Corporation, had entered into a series of collective bargaining agreements, each of which required the company to withhold union dues from wages of employees who had executed proper dues checkoff authorizations. As required by Section 302(c)(4) of the Act,[2] the dues authorization was irrevocable "for a period of one year from the date of its execution or for the duration of the applicable collective bargaining agreement, whichever occurs sooner."

The authorization provided for two escape periods within which employees could give notice of revocation—one "during the fifteen-day period previous to each anniversary date of this authorization" and the other "during the fifteen-day period preceding the expiration of the applicable collective bargaining agreement." Absent revocation, the authorization was automatically renewed for successive one-year terms.

In 1973, the current collective bargaining agreement was due to expire on November 1. On October 15, seventeen days before its expiration (and two days before the escape period), the parties executed a new collective bargaining agreement which would not expire until 1975. Several employees gave notice of revocation during the 15 days prior to the expiration of the old agreement (October 17–31, 1973). The union caused the company to refuse to honor the revocation notices as untimely, contending that the new collective bargaining agreement was the "applicable" one for determination of the contract expiration escape period. The company has continued to withhold dues from the wages of employees whose revocations were viewed by the union as "untimely."[3]

## II. The Unfair Labor Practice

■ Sections 8(b)(1)(A) and (2) of the National Labor Relations Act provide that it is an unfair labor practice for a union to coerce employees in the exercise of their Section 7 right to refrain from union membership,[4] or to cause the company to discriminate against employees in regard to "any term or condition of employment" in order to encourage or discourage union membership. If a union causes the employer to deduct and remit dues after valid revocation by the

1. 29 U.S.C.A. § 158(b)(1)(A), (2).

2. 29 U.S.C.A. § 186(c)(4).

3. The union is honoring revocations within the period immediately preceding the anniversary date of the individual employee authorization.

Indeed, it is this right to revocation which the union sees as a principal right accorded the employees by Congress under 302(c)(4).

4. 29 U.S.C.A. § 157.

employee of his dues authorization, it violates Sections 8(b)(1)(A) and (2). *Industrial Towel and Uniform Service,* 195 N.L.R.B. 1121 (1972), *enforcement denied on other grounds,* 6 Cir., 1973, 473 F.2d 1258.

The requirements for a valid dues authorization are found in Section 302(c)(4) of the Act which permits the employer to withhold and remit dues to a union provided that:

> the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner  .  .  ..

The authorization form used in the instant case tracked the statutory language in providing two chances to revoke dues authorizations, one on the anniversary date of the individual authorization, and one at the expiration of the "applicable" bargaining agreement.

The union concedes that employees have a statutory and contractual right to revoke during the expiration escape period of the "applicable" collective agreement. If the old agreement is "applicable," the employees' revocations were valid and timely, and the union's causing the company to continue to deduct dues violated Sections 8(b)(1)(A) and (2). If the new agreement is "applicable," either standing alone or as an extension of the old agreement, the union has not violated the Act. The question therefore is: which agreement is "applicable"?

### III. The "Applicable" Agreement

*Principles of contract interpretation.*

The union argues that the agreement in effect at the time of notice of revocation should be "applicable." Thus when the employees gave notice, the new agreement was already in effect, and revocation was untimely until the escape period upon expiration in 1975. This argument is contrary to established principles of contract interpretation.

■ The dues authorization is a contract between the employee and the employer, authorizing the employer to withhold dues from the employee's wages, but reserving to the employee the power of revocation at specified periods. It is elementary that an ambiguity in a contract, assuming an ambiguity *arguendo,* is to be interpreted in light of the circumstances surrounding the time the contract was made. *See* 3 Corbin on Contracts § 536 (1960). Because the power of revocation is a subsidiary provision of the dues authorization contract, a fortiori, it must be interpreted in light of circumstances surrounding the time the authorization contract was made. *See* 1A Corbin on Contracts § 265 (1963).

■ It is immaterial that the original execution date of each authorization is unknown, since all were renewed at least once yearly, and had therefore either been executed or renewed during the 1970–73 collective bargaining agreement. The legal consequences of renewal are exactly the same as execution of a new authorization. *See Monroe Lodge No. 770, I.A.M. v. Litton Business Systems, Inc.,* 334 F.Supp. 310, 316 (W.D.Va.1971), *aff'd,* 4 Cir., 1972, 80 LRRM 2379. Therefore, since the authorizations, of which the revocation provision is a subsidiary part, were executed or renewed during the 1973 collective bargaining agreement, that agreement is the "applicable" one whose expiration date provides an escape period for revocation.

### The continuity of union contracts doctrine.

The union next argues that even if the 1973 collective bargaining agreement is "applicable," under the continuity of union contracts doctrine, the new agreement is but an extension of the old agreement, and the two are merged into one. Since the two are treated as one continuous agreement, the expiration of the "applicable" agreement would not occur until 1975.

The union cites several cases for the proposition that:

where there is no time lapse between the terms of successive agreements, and union-security clauses thus have unmarred continuity, at least as to union security, the second contract is to be treated as a continuation of the previous one.

*International Union, UAW,* 142 N.L.R.B. 296, 301 (1963). *See Newspaper Guild of Brockton,* 201 N.L.R.B. 793 (1973), *petition for review denied,* 1 Cir., 1974, 493 F.2d 1024; *Hershey Chocolate Corp.,* 140 N.L.R.B. 249 (1961); *National Lead Co.,* 106 N.L.R.B. 545 (1953).

The flaw in the union's argument is its underlying assumption that dues checkoff is a union security device. The cases cited by the union concern maintenance of membership clauses, which are governed by a section of the Act[5] totally removed from the section governing dues checkoff, and which have a totally different purpose and rationale. The purpose of maintenance of membership clauses is to stabilize the collective bargaining process—basically, to protect the *union.* Employees can be discharged for failure to comply with maintenance of membership clauses.[6]

The dues checkoff section of the Act, on the other hand, far from being a union security provision, seems designed as a provision for administrative convenience in the collection of union dues. An employee could revoke the dues deduction authorization, and yet continue to pay dues personally. Section 302 generally prohibits payments from employers to unions, in order to prevent corruption, but Subsection (c)(4) makes an exception for dues deductions, *provided* that the employee gives voluntary written consent. The emphasis is on protection of the *employee,* not the union.

The Supreme Court has made it clear that union security devices and checkoff arrangements are separate entities, and that the latter are a matter of "individual freedom of decision" for the employee. *Felter v. Southern Pacific Co.,* 1959, 359

U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854. In *Felter,* a case arising under the Railway Labor Act, the Court held that the parties could not require employees to use a special form for revocation of checkoff authorizations.

The Court repeatedly emphasized that the parties could not, by the collective bargaining agreement, restrict the employees' revocation rights:

> . . . Congress consciously and deliberately chose to deny carriers and labor organizations authority to reach terms which would restrict the employee's complete freedom to revoke an assignment by a writing directed to the employer after one year. Congress was specifically concerned with keeping these areas of individual choice off the bargaining table.

359 U.S. at 333, 79 S.Ct. at 853, 3 L.Ed.2d at 860.

Rejecting the argument that the employees, as members of the union, were bound by the acts of the union acting as their agent in negotiating the collective bargaining agreement, the Court declared that

> . . . the proviso makes it clear that the organization was not to function as its members' agent in waiving their statutory revocation rights; we doubt whether the right to revoke could be waived at all in advance of the time for its exercise, but in any event, a waiver through the collective agreement would, under the statute, be the last conceivably permissible.

359 U.S. at 336, 79 S.Ct. at 854, 3 L.Ed.2d at 861.

The Court noted the difference between union security devices and the dues checkoff:

> The Act makes no formal relationship between a union-shop arrangement and a checkoff arrangement; under it the parties can negotiate either one without the other, if they are so disposed.

\*     \*     \*     \*     \*     \*

---

**5.** 29 U.S.C.A. § 158(a)(3).

**6.** We note that this case arose in Georgia, a right to work state in which union security

clauses in collective bargaining agreements are prohibited.

And of course a worker could revoke his checkoff authorization and remain a member of the same labor organization. It is clear that Congress meant to make the checkoff machinery stand on its own feet and be independent of any machinery for changing labor organizations . . . .

359 U.S. at 337, 79 S.Ct. at 855, 3 L.Ed.2d at 862, nn. 12, 13.

■ It is clear that the dues checkoff provisions are not union security devices but are intended to be an area of voluntary choice for the employee. This is true under the National Labor Relations Act as well as under the Railway Labor Act. *See NLRB v. Brotherhood of Railway, Airline & Steamship Clerks,* 5 Cir., 1974, 498 F.2d 1105, 1109. Therefore, the continuity of union contracts doctrine, developed to implement the statutory provisions protecting union rights, can have no relevance to the dues checkoff question before us, which arises from a statutory provision that the Supreme Court has emphatically interpreted as a protection of employee rights.

*Statutory guarantee of employee revocation rights.*

Finally, the union argues that holding the new collective bargaining agreement to be "applicable" will not *negate* the employee's right to revoke upon expiration of the collective bargaining agreement, but will merely *postpone* its exercise.[7] The Board disagreed, holding that Section 302(c)(4) *guarantees* an employee "two distinct rights" when he executes a dues checkoff authorization:

(1) a chance at least once a year to revoke his authorization, and

(2) a chance upon the termination of the collective bargaining agreement to revoke his authorization.

The Board stated that acceptance of the union's interpretation of the "applicable" agreement would:

enable it to negate the second right forever by the simple strategy of always negotiating a new agreement prior to the contractually created escape period. . . .

We do not believe that Congress, in enacting Section 302(c)(4) intended that the second of the two distinct employee rights guaranteed thereby could be negated by the device of such a premature contract renewal.

The congressional history sheds little light on the reason for the two escape periods. Senator Taft remarked in debate that the provision for irrevocability for the life of the contract or one year, was "substantially in accordance with nine-tenths of all check-off agreements and simply prohibits a check-off made without any consent whatever by the employee." 93 Cong.Rec. 4876 (1947).

■ We believe that Congress sought to strike a balance between employee and union protection. In making the authorization irrevocable, at least for a limited time, "conceivably Congress thought that a period of a year would better protect the union's position from deterioration through revocation of checkoff authorizations." *SeaPak v. Industrial Employees N.M.U.,* 300 F.Supp. 1197, 1199 (S.D.Ga.1969), *aff'd,* 5 Cir., 1970, 423 F.2d 1229, *aff'd,* 1971, 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434. But *Felter* makes it clear that Congress intended to preserve the employees' freedom of choice to refrain from union membership. The reason for the annual escape period was to allow the employee to reconsider at least once a year. Arguably, the reason for the contract expiration escape period was that the employee should have an opportunity to reconsider at the point when the collective bargaining agreement under which he paid dues would end. At that time either a new collective bargaining agreement would be negotiated, with terms as yet unknown, or there would be no contract in

---

**7.** The union relies on *American Smelting & Refining Co.,* 200 N.L.R.B. 1004 (1972). We find that it was concerned with the automatic renewal provision in the employee authoriza-

tion forms, and that it was decided on the particular language of the authorization. It bears little if any resemblance to the instant situation.

existence. The union concedes that when there is no collective bargaining agreement in effect, dues checkoff authorizations are revocable at will. *See Murtha v. Pet Dairy Products Co.,* 44 Tenn.App. 460, 314 S.W.2d 185 (1957).

Whatever the rationale, Congress provided for revocation at two distinct times: on the anniversary of the authorization, and at the termination of the collective bargaining agreement. In view of the clear statutory language and in view of the Supreme Court's decision in *Felter,* we hold that Section 302(c)(4) guarantees employees an opportunity to revoke dues checkoff authorizations at the expiration of each collective bargaining agreement. This statutorily guaranteed right may not be abrogated by the extension of the bargaining agreement by the union and the employer. If the employees' revocation right could be thus "postponed," it could be effectively eliminated by a series of such postponements.[8] We do not believe that Congress intended such a result.

Enforced.

---

8. The facts in this case support this hypothesis. The union admits in its supplemental brief that "as has been customary in their relationship through the years," Mead and the union have *again* executed a premature succession agreement, extending the termination date to 1977.