Manion, Circuit Judge, dissenting.
Section 302 of the Taft-Hartley Act, an amendment to the National Labor Relations Act, makes it a crime for an employer to give anything of value to a union representing, or seeking to represent, its employees. 29 U.S.C. § 186(a). But the law specifically exempts so-called "checkoff agreements," wherein an employee agrees to set off a portion of each paycheck for union dues, so long as the employee submits a written assignment not irrevocable *508 for more than one year. Id. § 186(c)(4). Thus, federal law prohibits checkoff agreements irrevocable for more than one year, but permits those with revocability periods of a year or less.
Nearly 50 years ago, a district judge held that Taft-Hartley's checkoff provision preempted a state law requiring checkoff agreements be revocable at will. Although the state law did not conflict with the federal checkoff provision, the judge concluded that "[t]he area of checkoff of union dues has been federally occupied to such an extent under [Section 302] that no room remains for state regulation in the same field." SeaPak v. Indus., Tech. & Prof'l Emps. , 300 F.Supp. 1197, 1200 (S.D. Ga. 1969). That decision was summarily affirmed first by the Fifth Circuit and then the Supreme Court, making it the law of the land. 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971) (mem.). As a result, states have been prohibited since 1971 from regulating checkoff agreements despite scant textual evidence of congressional intent to prevent them from doing so.
Enacted in 2015, Wisconsin's right-to-work law challenges this precedent. In addition to outlawing compulsory unionism, the law requires that checkoff agreements be terminable upon 30 days' notice to the employer. John Deere employee Lisa Aplin tried to take advantage of the new law by revoking her checkoff agreement, but the union, the International Association of Machinists, was not pleased and refused to accept her revocation. Aplin charged that the union committed an unfair labor practice, and the Wisconsin Department of Workforce Development agreed. But with the Supreme Court's summary affirmance in hand, the union obtained an injunction in federal district court.
The court today affirms, relying not only on SeaPak , but on the doctrine of Machinists preemption, a form of labor-specific preemption that didn't acquire its name until five years after the SeaPak decision. See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm. , 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In my view, the SeaPak summary affirmance deserves a fresh look. SeaPak 's holding that all state regulation of checkoff agreements is preempted does not fit comfortably within the Machinists doctrine. Nor does it stand up to any scrutiny under modern general preemption doctrine, which now requires much stronger textual indications of Congressional intent to displace state regulation. I conclude that developments over the last 47 years have eroded the precedential value of SeaPak to such an extent that we no longer are obliged to follow it. Therefore, I would permit Wisconsin to enforce its limitation on checkoff agreements. I respectfully dissent.
I. Background
Wisconsin's right-to-work law, known as Act 1, went into effect on July 1, 2015. Its main provision abolishes compulsory unionism, declaring that "[n]o person may require, as a condition of obtaining or continuing employment, an individual to ... [p]ay any dues, fees, assessments, or other charges or expenses of any kind or amount ... to a labor organization" or "any 3rd party." WIS. STAT. § 111.04(3)(a) 3 & 4. Further, when an employee chooses to pay dues to a union via a checkoff from the employee's paycheck, such checkoff agreement must be "terminable by the employee giving to the employer at least 30 days' written notice of the termination." Id. § 111.06(1)(i). The limitation on checkoff agreements permits employees more flexibility, allowing them to easily stop deductions from their paychecks.
Lisa Aplin worked for John Deere. The International Association of Machinists *509 had a collective bargaining agreement with John Deere to represent the employees at Aplin's plant, but Aplin never agreed to join the union. Nevertheless, she was still obligated before the right-to-work law went into effect to pay dues to the union. She had a checkoff agreement to facilitate that payment. But when her obligation to pay ceased on July 1, 2015, she sought to revoke the checkoff agreement as of July 31. The union refused to honor her revocation request because, according to the union, the request didn't comply with the collective bargaining agreement. Aplin filed a complaint with the Wisconsin Department of Workforce Development, and that agency agreed that the union had committed an unfair labor practice by refusing to accept a revocation deemed lawful under state law.
The union sought declaratory and injunctive relief in federal court on the ground that Wisconsin's restriction of checkoff agreements is preempted by federal law. The district court agreed, concluding that it was bound by the Supreme Court's summary affirmance in SeaPak . Int'l Ass'n of Machinists Dist. 10 v. Allen , No. 16-cv-77-wmc, 2016 WL 7475720 (W.D. Wis. Dec. 28, 2016). Wisconsin appealed.
II. Analysis
Preemption arises from the Constitution's Supremacy Clause, which says federal law "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Since state law may not contradict federal law, sometimes the latter will render the former unenforceable. Preemption "may be either express or implied," Fidelity Fed. Savings & Loan Ass'n v. de la Cuesta , 458 U.S. 141, 152-53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), but this case concerns implied preemption because "the [National Labor Relations Act] contains no express pre-emption provision," Chamber of Commerce v. Brown , 554 U.S. 60, 65, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008) ; see also 520 S. Mich. Ave. Assocs., Ltd. v. Shannon , 549 F.3d 1119, 1125 (7th Cir. 2008).
In implied preemption cases, we presume that "a state law should be sustained 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.' " 520 S. Mich. Ave. , 549 F.3d at 1125 (quoting Malone v. White Motor Corp. , 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) ). Typically, "[i]mplied preemption analysis does not justify a 'free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.' " Chamber of Commerce v. Whiting , 563 U.S. 582, 607, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n , 505 U.S. 88, 111, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ). Consistent with that principle, we generally "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' " Arizona v. United States , 567 U.S. 387, 400, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (quoting Rice v. Santa Fe Elevator Corp. , 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ). Most importantly, "[e]vidence of pre-emptive purpose is sought in the text and structure of the statute at issue." CSX Transp., Inc. v. Easterwood , 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In typical preemption cases, courts no longer attempt to read the tea leaves to determine congressional intent. See *510 Kurns v. R.R. Friction Prods. Corp. , 565 U.S. 625, 638, 132 S.Ct. 1261, 182 L.Ed.2d 116 (2012) (Kagan, J., concurring).
But this case concerns labor law. Must we throw general preemption principles, meant to preserve the traditional police power of the States, out the window in this context? The court thinks so. To that end, it contends that the SeaPak decision was an early application of (or at least consistent with) Machinists preemption. Machinists preemption is a species of field preemption in labor law that "forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended 'be unregulated because left to be controlled by the free play of economic forces.' " Brown , 554 U.S. at 65, 128 S.Ct. 2408 (quoting Machinists , 427 U.S. at 140, 96 S.Ct. 2548 ) (some internal quotation marks omitted). The rationale is that Congress' choice to protect and prohibit certain labor practices (in Sections 7 and 8 of the NLRA) implies congressional intent that whatever it did not protect or prohibit in those sections was meant to be left to bargaining, unregulated by the States. See 520 S. Mich. Ave. , 549 F.3d at 1125-26.
Because of this assumption regarding congressional intent, Machinists preemption is in some tension with general field preemption principles. As several justices have noted, "recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it." Kurns , 565 U.S. at 640-41, 132 S.Ct. 1261 (Sotomayor, J., concurring in part and dissenting in part) (quoting Camps Newfound/Owatonna, Inc. v. Town of Harrison , 520 U.S. 564, 617, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Thomas, J., dissenting) ); see also id. at 638, 117 S.Ct. 1590 (Kagan, J., concurring) (criticizing a 1920s application of field preemption as an "anachronism," noting that "Congress had 'manifest[ed] the intention to occupy the entire field of regulating locomotive equipment,' based on nothing more than a statute granting regulatory authority over that subject matter to a federal agency.").[1] Commentators, too, have noticed the Court's recent move away from broad application of field preemption. See Lauren Gilbert, Immigrant Laws, Obstacle Preemption and the Lost Legacy of McCulloch , 33 Berkeley J. Emp. & Lab. L. 153, 160 (2012) ("Consistent with the emphasis on states' rights in modern Commerce Clause and Tenth Amendment cases, the Court has tended over the last fifteen years to narrow the availability of field preemption and obstacle preemption, absent clear evidence of Congressional intent." (footnote omitted) ). But Machinists preemption necessarily infers congressional intent from silence. As then-Justice Rehnquist put it, "[t]he entire body of this Court's labor law pre-emption doctrine has been built on a series of implications as to congressional intent in the face of congressional silence, so that we now have an elaborate pre-emption doctrine traceable not to any expression of Congress, but only to statements by this Court in its previous opinions of what Congress must have intended." Golden State Transit Corp. v. City of Los Angeles , 475 U.S. 608, 623, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (Rehnquist, J., dissenting).
*511 Despite this tension, the Court has given no indication that Machinists is in danger of being overruled. See Brown , 554 U.S. at 68-69, 128 S.Ct. 2408. Yet the 2008 Brown decision, holding that a California law restricting certain speech about unions was preempted by the NLRA, relied in part on an express provision of the NLRA, Section 8(c), which "expressly precludes regulation of speech about unionization 'so long as the communications do not contain a threat of reprisal or force or promise of benefit.' " Id. at 68, 128 S.Ct. 2408 (quoting NLRB v. Gissel Packing Co. , 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) ). The Court said the existence of Section 8(c) (codified at 29 U.S.C. § 158(c) ) made that case "easier" than the typical NLRA preemption case "because it does not require us 'to decipher the presumed intent of Congress in the face of that body's steadfast silence.' " Id. (quoting Sears, Roebuck & Co. v. Carpenters , 436 U.S. 180, 188 n.12, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) ). And before Brown , the Court hadn't found a state law preempted under Machinists since Golden State in 1986.[2]
So, while Machinists is certainly still good law, I would hesitate to extend it beyond its current boundaries. After all, even in the labor context, the Supreme Court is "reluctant to infer pre-emption." Building & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc. , 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). "Federal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act." Metro. Life Ins. Co. v. Massachusetts , 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).
This leaves three main questions. First, can SeaPak be recast as a Machinists preemption case? If it cannot, can it be justified under modern general preemption doctrine? And if that does not work, must we still follow it simply because it is a merits decision of the Supreme Court and it has not been overruled? I will take these in turn.
A. SeaPak as a Machinists Case
The court contends that the Machinists preemption doctrine supports the SeaPak summary affirmance. It essentially seeks to recast SeaPak as a Machinists preemption case. Yet I cannot find any cases describing SeaPak this way.[3] On the other hand, courts have interpreted SeaPak as a general field preemption case (with no mention of Machinists ). Most recently, the Sixth Circuit characterized SeaPak as holding that "[a]llowing dual regulation under federal and state law would undermine Congress's purposes and contravene field preemption."
*512 United Auto., Aerospace, & Agric. Implement Workers of Am. Local 3047 v. Hardin Cty. , 842 F.3d 407, 421 (6th Cir. 2016). The court held that "[t]he analysis set forth in SeaPak is not conclusive, but it bears the Supreme Court's imprimatur and its authority remains essentially unchallenged by any conflicting case law authority." Id. ; see also United Food & Commercial Workers Local 99 v. Bennett , 934 F.Supp.2d 1167, 1181-82 (D. Ariz. 2013) ("In finding that the Georgia statute was preempted, the trial judge appeared to rely on both conflict and field preemption.").
Further, the SeaPak district court failed to mention any cases that the Supreme Court relied on to establish the Machinists preemption doctrine seven years later. Instead, it discussed both conflict and field preemption. The court first concluded that the federal and state statutes were "completely at odds" and could not "coexist." SeaPak , 300 F.Supp. at 1200. This was plainly wrong, since Georgia's law requiring checkoff authorizations to be revocable at will did not violate federal law; it was possible to comply with both provisions. Second, the court found "[t]he area of checkoff of union dues has been federally occupied to such an extent under [Section 302] that no room remains for state regulation in the same field." Id. For support, the court noted that the original version of the legislation in the House would have made it an unfair labor practice for checkoff authorizations to be irrevocable for more than 30 days, but a Senate amendment removed that provision. Id. The court rhetorically asked whether, if the legislation had included the original House version of the checkoff restriction, it would "have amounted to a clear Congressional mandate governing deduction of union dues in every state?" Id. Of course, it would have, so the court said it couldn't "be persuaded that Federal preemption fails merely because Congress saw fit to adopt a less liberal power of revocation and then incorporated it in a proviso." Id. Such an analysis is not comparable to Machinists preemption, but to anachronistic field preemption cases that have fallen out of favor in recent years. I would conclude that SeaPak was decided as a general field preemption case.[4]
Even so, leaving SeaPak to one side, does Machinists require preemption of the Wisconsin regulation here? Admittedly, "congressional intent to shield a zone of activity from regulation is usually found only 'implicit[ly] in the structure of the Act[.]' " Brown , 554 U.S. at 68, 128 S.Ct. 2408 (quoting Livadas , 512 U.S. at 117 n.11, 114 S.Ct. 2068 ). This means that States cannot legislate on top of the protections of Section 7 of the NLRA or the prohibitions of Section 8, on the theory that Congress intended everything else to be left to bargaining. See Cannon v. Edgar , 33 F.3d 880, 885 (7th Cir. 1994) ; 520 S. Mich. Ave. , 549 F.3d at 1125-26.
Had Congress included the language of Section 302(c)(4) of Taft-Hartley alongside the prohibitions of Section 8 of the NLRA, I might be persuaded that the rationale of Machinists required preemption of state regulations mandating shorter periods of irrevocability for checkoffs. Yet, that is not what happened. Instead, the language appears as an exception to a criminal law otherwise barring employers from giving anything of value to unions.[5]
*513 29 U.S.C. § 186(a). And as Wisconsin points out, the Department of Justice, not the NLRB, enforces Section 302's criminal prohibition. Section 302(c)(4)'s position as a safe-harbor exception to a criminal law, rather than as a regulation of the collective bargaining process under Sections 7 and 8 of the NLRA, counsels against a finding of preemption. Moreover, Congress does not "hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns , 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). If Congress intended to grant unions an affirmative right to bargain for checkoff agreements irrevocable for a year, it seems highly unlikely it would have placed the language of Section 302(c)(4) in a "provided that" clause of an exception to an anti-bribery statute. Cf. City of Chicago v. Sessions , 888 F.3d 272, 285 (7th Cir. 2018) (noting that "[a] clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose any conditions on any grants").
Further cutting against Machinists preemption is that dues checkoff is "designed as a provision for the administrative convenience in the collection of union dues." NLRB v. Atlanta Printing Specialties and Paper Prods. Union 527, AFL-CIO , 523 F.2d 783, 786 (5th Cir. 1975). As the Fifth Circuit explained, "Section 302 generally prohibits payments from employers to unions, in order to prevent corruption, but Subsection (c)(4) makes an exception for dues deductions, provided that the employee gives voluntary written consent. The emphasis is on protection of the employee, not the union." Id. The same is true of the one year limit on irrevocability. If Section 302(c)(4) grants rights to anyone (and it does not appear to do so), it is the employee, who is entitled to exercise his or her free choice to revoke checkoff agreements. See id. at 786-87 ; Felter v. S. Pac. Co. , 359 U.S. 326, 333, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959) (limitations on checkoff agreements are a matter of the "employee's freedom of decision"). In light of this, I cannot agree that Section 302(c)(4) grants unions the right to bargain for one year of irrevocability. Nor can I conclude that Congress, in permitting limited checkoff agreements for convenience, intended to prevent the States from further preserving an employee's right to freedom of choice.
As this case demonstrates, the revocability of dues checkoff agreements can pit an individual employee, who desires to revoke her checkoff authorization, against the union, which would prefer to receive automatic dues for the remainder of the agreement. That this case is about employee freedom from the union substantially distinguishes it from the typical Machinists case dealing with "Congress' intentional balance between the power of management and labor to further their respective interests by use of their respective economic weapons." Cannon , 33 F.3d at 885. While management and labor may bargain over the existence and terms of checkoff agreements, neither side adequately represents the freedom of employees to revoke their agreements. It is in the union's interest to procure the maximum irrevocability period allowed under the law, not to bargain for the best interests of its members. Simply put, this case does not involve the same type of regulation of collective bargaining *514 that has justified Machinists preemption in the past.
Lastly, the court says that the Supreme Court reached the "same conclusion" as SeaPak in Felter , but I do not see how Felter helps the court. That case was about whether, under the Railway Labor Act's checkoff provision, a union could require an employee to submit his revocation on a particular form furnished by the union. The provision at issue stated that no checkoff agreement "shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization ... which shall be revocable in writing after the expiration of one year....." Id. at 327, 79 S.Ct. 847. The Supreme Court held that Congress intended employees to be able to freely revoke their agreements after the year was up. It saw "no authority given by the Act to carriers and labor organizations to restrict the employee's individual freedom of decision" in collective bargaining. Id. at 333, 79 S.Ct. 847.
Felter was not a preemption case. It simply interpreted the terms of a particular statute that granted a limited authority to labor and management to bargain for checkoff agreements, subject to each employee's ability to revoke his agreement after a year. To be sure, the Supreme Court held that labor and management could not bargain for additional requirements beyond "a written assignment," but it said so because it interpreted the statute as preserving employee freedom. The up-to-one-year provision in Section 302(c)(4) is similar in that it protects employees from certain bargaining decisions. In some ways, that makes these provisions counter-examples for Machinists preemption. Rather than reserving a zone of freedom for bargaining, the statutes in Felter and here reserve a zone of freedom for employee choice. I cannot conclude that Machinists precludes States from expanding that zone.
In sum, I conclude that the Wisconsin law is not preempted under Machinists .[6] Therefore, I must continue to determine whether the SeaPak district court's general preemption conclusions are still binding on us today.
B. SeaPak under Modern General Preemption Doctrine
Can SeaPak withstand scrutiny under modern preemption doctrine? First, a quick review of general implied preemption.
*515 It "comes in two types: (1) field preemption, which arises when the federal regulatory scheme is so pervasive or the federal interest so dominant that it may be inferred that Congress intended to occupy the entire legislative field; and (2) conflict preemption, which arises when state law conflicts with federal law to the extent that 'compliance with both federal and state regulations is a physical impossibility,' or the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Planned Parenthood of Ind., Inc., v. Comm'r of Ind. State Dep't of Health , 699 F.3d 962, 984 (7th Cir. 2012) (quoting Arizona , 567 U.S. at 399, 132 S.Ct. 2492 ). So we have three types of preemption: field preemption and two species of conflict preemption known as impossibility and obstacle preemption. Importantly, preemption analysis "begins with a presumption against preemption and focuses first on the text of the statute." Id .
Impossibility preemption applies only where it is actually "impossible for a private party to comply with both the state and federal law." Patriotic Veterans, Inc. v. Indiana , 736 F.3d 1041, 1049 (7th Cir. 2013). Although the SeaPak district court said that the federal and state statutes in that case were "completely at odds" and could not "coexist," SeaPak , 300 F.Supp. at 1200, it was plainly wrong. Like the revocable-at-will provision at issue in SeaPak , the 30-day irrevocability period now mandated by Wisconsin law does not violate federal law. Federal law makes an employer payment to a union under a checkoff agreement a crime only if such agreement is irrevocable for more than one year. The 30-day Wisconsin period falls within the safe-harbor exception granted by Section 302(c)(4) of the Taft-Hartley Act. Since a 30-day irrevocability period complies with both state and federal law, SeaPak cannot be justified under impossibility preemption.[7]
Regarding obstacle preemption, the SeaPak district court attempted to ascertain the purpose behind Section 302(c)(4), noting that Senate debate revealed "deep concern about checkoffs and the period during which they may be irrevocable." Id. The court theorized that "Congress 'was not indifferent to that subject, but on the contrary, was so vitally interested therein, that it established certain conditions precedent which an employer must meet before he may 'check-off' membership dues.' " Id. (quoting State v. Montgomery Ward & Co. , 120 Utah 294, 233 P.2d 685, 688 (1951) ). That finding was enough for the district court to hold Georgia's checkoff restriction preempted for creating an obstacle to the enforcement of federal law.
This analysis was questionable in 1969, but it is totally untenable today. As I noted above, today's "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.' " Whiting , 563 U.S. at 607, 131 S.Ct. 1968 (quoting Gade , 505 U.S. at 111, 112 S.Ct. 2374 ( (Kennedy, J., concurring in part and concurring in the judgment) ) ). Looking to the text and structure of the law, and keeping in mind the presumption against preemption, I would conclude that obstacle preemption is inapplicable here. That is for much the same reason that I have already concluded Machinists is inapplicable, although the finding comes easier in the general preemption *516 context since we need not worry about the inferences drawn from congressional silence that permeate Machinists cases. In short, nothing in the text of the NLRA, Taft-Hartley generally, or Section 302(c)(4) specifically indicates any federal objective that would be frustrated by Wisconsin's regulation.
Finally, we have general field preemption. In its most sweeping conclusion, the SeaPak district court declared that "[t]he area of checkoff of union dues has been federally occupied to such an extent under [Section 302] that no room remains for state regulation in the same field." SeaPak , 300 F.Supp. at 1200. It reached this conclusion relying entirely on legislative history. See supra at 496. But, as discussed above, "recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it." Kurns , 565 U.S. at 640-41, 132 S.Ct. 1261 (Sotomayor, J., concurring in part and dissenting in part) (quoting Camps Newfound/Owatonna , 520 U.S. at 617, 117 S.Ct. 1590 (Thomas, J., dissenting) ). The preemption theory the SeaPak district court advanced was entirely atextual, based instead on words Congress rejected . SeaPak , 300 F.Supp. at 1200. While such cavalier use of legislative history to determine congressional intent was commonplace at the time, see Citizens to Preserve Overton Park, Inc. v. Volpe , 401 U.S. 402, 412 n.29, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (where the legislative history is ambiguous, courts should look to the statute to determine legislative intent), it has thankfully fallen out of favor, see Lamie v. U.S. Trustee , 540 U.S. 526, 534, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (even though a statute was "awkward" and "ungrammatical," it was not ambiguous and so the Court could not consult legislative history). No court today would find that Congress intended to occupy an entire field based on language that failed to make it into the final bill.
Writing on a clean slate, I would conclude that Wisconsin should be permitted to enforce its limitation on dues checkoff agreements. Nevertheless, I recognize that the Supreme Court's summary disposition in SeaPak retains some precedential force. Thus, the final question is whether, even assuming SeaPak was wrongly decided, we should still follow it.
C. Is SeaPak Still Binding?
Unlike a denial of certiorari, a summary disposition of the Supreme Court is a decision on the merits of a case. See Hicks v. Miranda , 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). Therefore, "unless and until the Supreme Court should instruct otherwise," inferior courts should treat summary dispositions as binding "except when doctrinal developments indicate otherwise." Id. (quoting Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth. , 387 F.2d 259, 263 n.3 (2d Cir. 1967) ).[8] Not surprisingly, the scope of that "doctrinal developments" exception has been the subject of significant debate.
In Baskin v. Bogan , 766 F.3d 648 (7th Cir. 2014), this court considered the constitutionality of the marriage laws of Indiana and Wisconsin. We confronted the Supreme Court's summary disposition in Baker v. Nelson , 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972) (mem.), which had dismissed an appeal from a same-sex couple *517 challenging Minnesota's marriage laws "for want of a substantial federal question." That decision was no longer binding on the lower courts, we said, because subsequent doctrinal developments in cases like Romer v. Evans , 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), Lawrence v. Texas , 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), and United States v. Windsor , 570 U.S. 744, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), "make clear that Baker is no longer authoritative." Baskin , 766 F.3d at 660. We so concluded even though none of those cases had questioned Baker 's conclusion that no federal constitutional right to same-sex marriage existed. Indeed, on the same day it decided Windsor , the Supreme Court also ruled in Hollingsworth v. Perry , 570 U.S. 693, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013), that it lacked jurisdiction to address the marriage question. See also Lawrence , 539 U.S. at 585, 123 S.Ct. 2472 (O'Connor, J., concurring in the judgment) ("Texas cannot assert any legitimate state interest here, such as national security or preserving the traditional institution of marriage ." (emphasis added) ). The Court ultimately addressed that question in Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), but we didn't think it necessary to wait for the Court to overrule its summary disposition in Baker before we invalidated the Indiana and Wisconsin laws.[9]
If we were willing to discard Baker in light of these cases, the same should apply here. As I have demonstrated, the Supreme Court's preemption jurisprudence has evolved significantly since SeaPak . The Court is now much more sensitive to federalism concerns and far less likely to imply preemption from ambiguous statutes or legislative history. The SeaPak district court's analysis perhaps made some sense in 1969, but it cannot stand alongside modern preemption doctrine. Therefore, under Baskin , I would no longer regard it as binding.
III. Conclusion
Wisconsin has challenged a decades-old Supreme Court summary affirmance preventing it from legislating to provide employees additional freedom to revoke agreements to check off union dues from their paychecks. I conclude that the precedential value of that case, SeaPak v. Industrial, Technical & Professional Employees , 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971) (mem.), has been so eroded by changes to preemption doctrine that we should no longer follow it. The court, perhaps sensing that SeaPak is on weak ground under general preemption principles, mostly defends it as an early *518 application of labor-specific Machinists preemption. But not only was SeaPak not a Machinists case, Machinists is inapplicable to the Wisconsin law as a matter of first impression. Nor can the result be justified under modern preemption doctrine, which grants the States far more latitude to legislate alongside federal law than they once had.
I do not lightly recommend declining to follow Supreme Court precedent. But the SeaPak decision cannot stand up to scrutiny under today's preemption doctrines. I am convinced that a court deciding this case today, writing on a clean slate, would find Wisconsin's law not preempted. The changes to preemption doctrine have been so significant that we need no longer follow SeaPak . Therefore, Wisconsin should be permitted to enforce its limitation on dues checkoff provisions.
I respectfully dissent.

The court points out that the Supreme Court in Kurns still followed the arguably anachronistic preemption holding. But the Court's commitment to stare decisis is far stronger when it has issued an opinion on the merits than when the prior case is only a summary disposition. Ill. State Bd. of Elections v. Socialist Workers Party , 440 U.S. 173, 180-81, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). So while stare decisis could have justified the result in Kurns (especially in a statutory case), the same might not be true were the Court to reevaluate SeaPak .

In Livadas v. Bradshaw , 512 U.S. 107, 117 n.11, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994), the Court mentioned Machinists preemption in a footnote, saying that in that particular case the difference between typical conflict preemption and Machinists was "entirely semantic, depending on whether Livadas's right is characterized as implicit in the structure of the Act (as was the right to self-help upheld in Machinists ) or as rooted in the text of § 7."

The district court in Georgia State AFL-CIO v. Olens , 194 F.Supp.3d 1322, 1330-31 n.5 (N.D. Ga. 2016), noted in a footnote that "[d]espite regulation determining the boundaries of bargaining in this regard, the NLRA left a window between revocable checkoff authorizations and irrevocable authorizations up to a year that would appear susceptible to a challenge under Machinist [sic] preemption as well." But the court did not characterize SeaPak as a Machinists case. Rather, it said that even putting SeaPak to one side, Machinists preemption might also apply.

Nothing in the question presented or the limited briefing available from the SeaPak appeals demonstrates that the Fifth Circuit or the Supreme Court considered Machinists -like arguments either.

The court says that Section 302(c)(4)'s placement as a criminal law, rather than, say, an unfair labor practice prohibited under Section 8 of the NLRA, simply means that Congress was really committed to the issue. Surely, Congress was concerned with the extended irrevocability of checkoff agreements. But Section 302 is primarily a prohibition of employer payments to unions, not a regulation of the collective bargaining process. Checkoffs are only permitted in the first instance as an exception to this general rule, and generally because they are convenient. The structure of the section thus indicates that Congress likely intended simply to place a limit, for the benefit of employees, on its allowance of checkoff agreements. I do not believe we can infer preemption from such a statutory structure.

The court also suggests that the Wisconsin law might be preempted under San Diego Building Trades Council v. Garmon , 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In Garmon , "the Court held that '[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.' " NLRB v. State of Ill. Dep't of Emp't Sec. , 988 F.2d 735, 738 (7th Cir. 1993) (quoting Garmon , 359 U.S. at 245, 79 S.Ct. 773 ). This case does not concern activity even arguably protected by Section 7 or prohibited by Section 8 of the NLRA. Moreover, Garmon preemption "seeks to protect the NLRB's primary jurisdiction in cases involving sections 7 and 8 of the NLRA." 520 S. Mich. Ave. , 549 F.3d at 1125. But the NLRB has no jurisdiction here; it does not enforce Section 302 of the Taft-Hartley Act.
Further, I would not consider a checkoff agreement to be a wage-related term of employment under Section 8(a)(5) of the NLRA. A checkoff is a device of convenience that allows an employee to more easily pay union dues. It has no effect on the employee's wages or work conditions. Even where the union and management bargain for the existence of checkoffs, employees need not take advantage of them. It is hard to see how a voluntary agreement to pay union dues out of one's paycheck would constitute a term of employment at all.
For these reasons, I would conclude that Garmon preemption is inapplicable.

The text of Section 8 of the NLRA provides no indication that a 30-day period of irrevocability would constitute an unfair labor practice under federal law, so I do not see how the NLRB could possibly sanction any private parties for complying with Wisconsin law.

As I noted above, the Supreme Court has said "that summary affirmances have considerably less precedential value than an opinion on the merits." Socialist Workers Party , 440 U.S. at 180-81, 99 S.Ct. 983. However, this appears to apply only to the Supreme Court's decisions whether to overrule its own cases. As a lower court, we are bound by summary affirmances unless the Hicks doctrinal developments exception applies.

Not everyone shares our willingness to "jump the gun" on "overruling" the Supreme Court's supposedly "outdated" cases. In the same marriage context, the Sixth Circuit insisted that Baker was still binding on lower courts. Judge Sutton wrote that circuit courts may only "ignore a Supreme Court decision" in two circumstances: "when the Court has overruled the decision by name (if, say, Windsor had directly overruled Baker ) or when the Court has overruled the decision by outcome (if, say, Hollingsworth had invalidated the California law without mentioning Baker )." DeBoer v. Snyder , 772 F.3d 388, 401 (6th Cir. 2014), rev'd on other grounds sub nom. Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). In his view, "[a]ny other approach returns us to a world in which the lower courts may anticipatorily overrule all manner of Supreme Court decisions based on counting-to-five predictions, perceived trajectories in the caselaw, or, worst of all, new appointments to the Court." Id.
I am sympathetic to Judge Sutton's narrower approach to the Hicks exception, but Baskin remains the law in our circuit. If it were otherwise, this dissent would take the form of an opinion concurring in the judgment.